**Norma HOLDEN, et al., Plaintiffs,**

**and**

**State of Ohio, Through Richard F. Celeste, Governor, Intervenor,**

**v.**

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Gerald BREST, Plaintiff,**

**v.**

**Margaret HECKLER, Secretary of Health and Human Services, Defendant.**

Civ. A. Nos. C84–548, C83–4893.

United States District Court,
N.D. Ohio, E.D.

April 30, 1984.

Opinion on Motion for Stay Pending Appeal May 29, 1984.

Mark J. Valponi, David B. Dawson, Paula Gellman, Cleveland, Ohio, for plaintiffs.

Kathleen Ann Sutula, Steven D. Bell, Asst. U.S. Attys., Cleveland, Ohio, Rita S. Eppler, Asst. Atty. Gen., Columbus, Ohio, for defendant.

| I. | PROCEDURAL HISTORY | 3 |
|---|---|---|
| II. | DISABILITY PAYMENTS UNDER THE SOCIAL SECURITY ACT: SSDI AND SSI | 5 |
| III. | THE NAMED PLAINTIFFS AND CLASS MEMBERS | 23 |
| IV. | JURISDICTION | 35 |
| V. | CLASS CERTIFICATION | 53 |
| VI. | PRELIMINARY INJUNCTION | 60 |
| VII. | RELIEF | 71 |

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This class action raises statutory and constitutional challenges to policies and procedures by which federal and state officials have terminated social security disability benefits without demonstrating by substantial evidence that the recipients are no longer disabled within the meaning of the law. The plaintiffs contend that this practice causes widespread financial hardship and physical and mental suffering and is being conducted in defiance of the Sixth Circuit Court of Appeals' clear and consistent rulings interpreting the Social Security Act. They seek relief forbidding the bureaucracy that grants disability benefits from revoking them unless it proves that the recipient's medical condition has improved, and restoring benefits to individuals who were wrongfully terminated. After considering complicated legal questions and compelling testimony by victims of the termination policy, this Court certifies this case as a class action and orders the declaratory and injunctive relief set forth below.

## I. PROCEDURAL HISTORY

This opinion deals with two virtually identical class actions filed with this Court in recent months: *Brest v. Heckler*, No. C83–4893 (N.D.Ohio filed Dec. 14, 1983) and *Holden v. Heckler*, No. C84–548 (N.D. Ohio filed Feb. 16, 1984). On March 12, the two actions were consolidated under Fed.R. Civ.P. 42(a). The parties argued the plain-

tiffs' Joint Motion for Class Certification on March 21, after which the proposed class in *Holden* was tentatively certified.[1] A day-long hearing on plaintiffs' Joint Motion for a Preliminary Injunction was held on March 30.

The plaintiffs in both cases challenged programs administered jointly by the Social Security Administration ("SSA"), part of the Department of Health and Human Services ("HHS"), and by the Ohio Bureau of Disability Determinations ("BDD"); the original defendants in each case were Margaret M. Heckler, the Secretary of HHS ("Secretary"), and Leonard F. Herman, the director of the BDD. Since the State of Ohio had previously appeared as *amicus curiae* for the plaintiffs in a similar class action, *Mental Health Association of Minnesota v. Heckler*, 720 F.2d 965 (8th Cir. 1983), it negotiated to alter its role in this case. On March 29, the State and the plaintiffs submitted a stipulated motion dismissing Herman as a defendant, which was granted. After oral argument at the preliminary injunction hearing the following day, the State was permitted to intervene as a plaintiff under Fed.R.Civ.P. 24(b) and participate in the hearing. The Secretary was given leave to move to dismiss the complaint in intervention, and subsequently did so.

The named plaintiffs, the tentatively certified *Holden* class, and the State of Ohio are now aligned against the Secretary, who is the sole defendant. Jurisdiction over her is invoked under the general federal question jurisdictional provision, 28 U.S.C. § 1331; the mandamus jurisdiction provided by 28 U.S.C. § 1361; judicial review provisions of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3); the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 702. In addition to moving to dismiss the State, the Secretary has challenged this Court's subject matter jurisdiction over the class in a number of her pleadings.

## II. DISABILITY PAYMENTS UNDER THE SOCIAL SECURITY ACT: SSDI AND SSI

### A. *Initial Determinations of Disability*

#### 1. The Programs

The named plaintiffs and the proposed class members are all residents of Ohio who currently receive, or formerly received, benefits under Title II or Title XVI of the Social Security Act ("Act"). Title II provides Social Security Disability Insurance ("SSDI") benefits to disabled workers based upon their earnings records. 42 U.S.C. §§ 401–431. Title XVI, the Supplemental Security Income ("SSI") program, provides disability payments to the aged, blind, and disabled if they meet certain income eligibility standards. 42 U.S.C. §§ 1381–1383. Both programs were established to relieve state and local governments of the financial burden of assisting the disabled. SSDI was enacted in 1956 and SSI in 1972, and both programs expanded far beyond their sponsors' expectations. In 1956 approximately 150,000 Americans drew some $59 million in SSDI benefits; by 1982 more than four million

---

**1.** The plaintiffs requested certification of the following class:

All Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) beneficiaries residing in the State of Ohio who have been or are receiving disability benefits and who have presented or will present a claim to the defendants that their disabilities have continued and whose entitlements have been terminated or may be terminated without the application of an improvement standard to their case, or who have been terminated or may be terminated due to the failure of the defendants to give presumptive effect to the prior determination of disability.

At the March 21 hearing, while tentatively certifying this class, this Court endorsed the caveat set forth in *Trujillo v. Heckler*, 558 F.Supp. 1058, 1064 (D.Colo.1983):

... The class excludes SSDI and SSI disabled beneficiaries whose benefits were terminated because they have returned to substantial gainful activity, whose whereabouts are now unknown, who failed to cooperate, who admit they have medically recovered, or who are no longer eligible because of nondisability factors.

The final, more refined definition of the class is stated in Part V–C, *infra*.

workers and beneficiaries drew an estimated $18.5 billion in SSDI and SSI funds. *See* S.Rep. No. 97–648, 97th Cong., 2d Sess. 13–16, *reprinted in* 1982 U.S.Code Cong. & Ad.News 4373, 4384–87.

Under both the SSDI and SSI programs, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Secretary promulgates regulations governing determination of eligibility for disability payments. 20 C.F.R. pt. 404, subpt. P; 20 C.F.R. pt. 416, subpt. I. These complex regulations implement the broad congressional directive expressed in 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B), which requires that an individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy". Under 42 U.S.C. §§ 421 and 1383b, state agencies conduct disability determinations pursuant to contracts with the Secretary; BDD, a unit of the Ohio Rehabilitative Services Commission, makes all determinations of initial and continuing disability in the State of Ohio.

### 2. The Implementing Regulations and the Five-Step Evaluation

The regulations create a five-step "sequential evaluation" process for evaluating benefits claims by applicants and recipients. The first step disqualifies individuals who are engaged in "substantial gainful activity". 20 C.F.R. §§ 404.1520(a), 416.920(a). Claimants who pass this barrier must then demonstrate that their impairment is severe; if it is not, benefits may not be issued. §§ 404.1520(c), 416.920(c). If the individual meets or equals a disability described in the "Listing of Impairments", he or she is presumed disabled and

automatically receives benefits. §§ 404.-1520(d), 416.920(d); *see* subpt. P, app. 1 (list of conditions, signs, symptoms).

An individual with a severe impairment that does not meet or equal any of the listed impairments is evaluated under the fourth step, which involves two sub-steps: (1) a determination of the claimant's residual functional capacity ("RFC"); and (2) a determination of whether the claimant has sufficient RFC to return to the physical or mental demands of the work he or she performed in the past. §§ 404.1520(e), 416.920(e). The RFC assessment is not limited to formal medical findings; it includes other pertinent, informal evidence. If the individual can do his or her past work, no benefits are awarded. If not, the fifth and final test is applied: a determination of whether the individual is unable to do other work which exists in substantial numbers in the economy. §§ 404.1520(f), 416.920(f). This assessment includes evaluations of the claimant's age, education, and work experience. If the claimant would be unable to perform this "other work", he or she is awarded benefits.

The regulations thus provide two paths claimants can follow to obtain benefits: (1) a listed impairment; or (2) a lack of RFC combined with an inability to do other work.

All initial disability claims are made by lay examiners employed by BDD. If the claim is denied, the claimant may ask for reconsideration by BDD. A claimant who receives a second adverse decision may appeal to an Administrative Law Judge ("ALJ"), an Article I judge employed by the SSA. Adverse decisions by the ALJ may be appealed to the SSA Appeals Council; adverse decisions by the Council may be appealed to federal district court pursuant to 42 U.S.C. § 405(g).

### B. Termination of Disability Payments

### 1. Interpretation of the Act: 1954–1976

Title 42 U.S.C. § 423(a)(1)(D) governs termination of SSDI disability benefits. In pertinent part it provides:

... [T]he termination month for any individual shall be the third month following the month in which his disability ceases; except that, in the case of an individual who has a period of trial work ..., the termination month shall be the earlier of (I) the third month following the earlier month after the end of such period of trial work with respect to which such individual is determined to no longer be suffering from a disabling physical or mental impairment, or (II) the third month following the earliest month in which such individual engages or is determined able to engage in substantial gainful activity....

While there is no parallel statutory section concerning SSI terminations, the Secretary has promulgated identical regulations governing terminations under the two programs,[2] and the allocation of the burden of proof between the claimant and the Secretary shall be considered the same for each program.

The legislative history accompanying passage of the SSDI program in 1956 provides few clues as to whether Congress did or did not intend that an individual who was awarded benefits would be entitled to receive them until his or her underlying condition improved. The relevant conference report stated that the term "disability ceases" was added to the statute to terminate payments to individuals who were "no longer disabled". Conf.Rep. No. 2936, 84th Cong., 2d Sess. *reprinted in* 1956 U.S.Code Cong. & Ad.News 3877, 3956. However, the legislative history of subsequent amendments to the Act indicates that one of the Congressional panels with jurisdiction over the SSA, the Senate Finance Committee, consistently has read the phrase "disability ceases" to require that the claimant's medical condition actually have improved before his benefits may be terminated.[3] In 1960 it read a statutory reference to the month in which a recipient's "disability ceases" to mean "the month in which his physical or mental impairment improves to a point where . : ." S.Rep. No. 1856, 86th Cong., 2d Sess. *reprinted in* 1960 U.S.Code Cong. & Ad.News 3608, 3703 (discussing Pub.L. No. 86–778, § 403(a), 74 Stat. 924). In 1965 it interpreted "the day disability ceased" to permit the Secretary "to terminate entitlement to disability benefits in cases of recovery ..." S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad. News 1943, 2044. And in 1980 the committee stated that "[u]nder the present law an individual is not entitled to [SSDI] and SSI benefits after he has medically recovered". S.Rep. No. 96–408, 96th Cong., 1st Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad. News 1277, 1282 (discussing Pub.L. 96–265, § 301(a), codified at 42 U.S.C. § 425(b)).

In 1982 and 1983 Congress considered, but did not pass, amendments explicitly adopting a medical improvement standard. Sponsors stressed that the purpose of the amendments was not to "change the status quo" or to "overturn[ ] current case law" applying the improvement standard but to reaffirm it. *See* 128 Cong.Rec. S13861 (daily ed. Dec. 3, 1982) (statement of Sen. Metzenbaum). Since this case began, the House of Representatives has passed H.R. 3755, the Social Security Disability Insurance Amendments of 1984. Section 101 establishes an explicit medical improvement standard for terminations.[4] Both

---

**2.** *See* 20 C.F.R. §§ 404.1594 and 416.994, discussed in Part II–B–2, *infra*.

**3.** "[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, ... such views are entitled to significant weight, ... and particularly when the precise intent of the enacting Congress is obscure." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980) (citations omitted); *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

**4.** Section 101(a) of H.R. 3755 provides, in part, that the Secretary may terminate benefits by showing that an individual's physical or mental impairment "has ceased, does not exist, or is not disabling" so that "the individual is now able to engage in substantial gainful activity". Such a showing can only be made through:

(1) substantial evidence which demonstrates that there has been medical improvement in the individual's impairment or combination of impairments ... or

(2) substantial evidence which—

H.R.Rep. 98–618, 98th Cong., 2d Sess. (March 14, 1984) ("House Report") and the debate prior to the 410–1 vote adopting the bill, 130 Cong.Rec. H1956–93, (daily ed. March 27, 1984), applaud judicial decisions discerning a medical improvement standard in the SSDI and SSI statutes; the purpose of the bill is to codify those decisions and establish "a clear 'medical improvement' standard that creates a category of beneficiaries who, because their medical conditions have not improved, are presumed to be unable to work and who therefore must continue to receive benefits." House Report at 11. The Committee recognized that "the criteria for termination of benefits as a result of review were left unstated in the law", *Id.*, but nowhere criticizes the unanimous earlier legislative and judicial readings of the phrase "disability ceases" as requiring a medical improvement standard.

## 2. The SSA's Abandonment of the Medical Improvement Standard

Secretaries of Health, Education and Welfare concurred with Congress' reading of the statutes and applied a medical improvement standard to disability terminations from 1954 until 1976. So did various courts which interpreted the Act during those years. *See Hall v. Celebrezze*, 314 F.2d 686, 688 (6th Cir.1963) ("Once a condition has been shown to exist, there is a presumption, in the absence of proof to the contrary, that it has continued.")

In 1976, the Secretary abandoned the medical improvement standard and instituted a "current disability standard". The parties in this case have stipulated that:

Upon instruction of defendant Heckler and her predecessors, BDD has since June 1, 1976 applied a standard of current disability to continuing disability claims of Ohio residents ... and has not applied a medical improvement standard or presumption of disability standard to these cases.

In August of 1980, the Secretary formally promulgated regulations interpreting the Act as not requiring that there be medical improvement in the claimant's disability before termination.[5] Responding to arguments that a showing of medical improvement had to be made before benefits could be terminated, she stated:

... These recodified regulations make it clear that disability ends when current evidence shows that the individual is able to engage in [substantial gainful activity] regardless of whether actual improvement can be demonstrated.... We do

---

(A) consists of new medical evidence and ... a new assessment of the individual's residual functional capacity and demonstrates that, although the individual has not improved medically, he or she is nonetheless a beneficiary of advances in medical or vocational therapy or technology ... [or]

(B) demonstrates that, although the individual has not improved medically, he or she has undergone vocational therapy so that [he or she is capable of substantial gainful activity, or]

(3) substantial evidence which demonstrates that, as determined on the basis of new or improved diagnostic techniques or evaluations, the individual's impairment or combination of impairments is not as disabling as it was considered to be at the time of the most recent prior decision that he or she was under a disability or continued to be under a disability....

5. Title 20 C.F.R. §§ 404.1594, 416.994 (1983), announced simultaneously, provides in part:

(a) General. When the medical or other evidence in your file shows that your disability has ended, we will contact you and tell you that the evidence in your file shows that you are able to do substantial gainful activity and that your eligibility for cash benefits and for a period of disability will end. Before we stop your benefits or a period of disability, we will give you a chance to give us your reasons why we should not stop your benefits or your period of disability....

Commenting on the regulations in the *Federal Register,* the Secretary stated:

In ... 404.1594 and 416.994 we explain a new policy on when disability is considered to stop. At one time we would not find that disability or blindness had stopped unless the medical evidence showed that the person's condition had improved since we last determined that he or she was disabled. About three years ago, we changed this policy and began to find that disability or blindness had stopped if we found, on the basis of new evidence, that the person was not disabled or blind as defined in the law.

45 Fed.Reg. 55568.

not agree that a finding that a person is disabled or blind should be allowed to stand in the face of evidence to the contrary simply because of the lack of evidence clearly showing medical improvement.

45 Fed.Reg. 55583 (August 20, 1980).

In addition to the 1980 regulations, HHS has set forth the current disability standard in numerous internal publications. *See* Program Operations Manual System [POMS] § 2864 ("The question to be resolved is whether the individual is currently disabled"); Social Security Ruling 81–6 ("It will not be necessary to determine whether or how much the individual's condition has medically improved since the prior favorable determination") (and cross-references cited therein); 6 OHA Law Reporter No. 3 at 20 (July 1982) (published by SSA Office of Hearings and Appeals) ("... there is no current regulatory criteria demanding improvement in any impairment or impairments before a finding of cessation").

3. Implementation of Continuing Disability Investigations

The Secretary's new termination criteria grew in significance when she began to conduct the periodic reviews of disability recipients that Congress mandated in the Social Security Amendments of 1980. During the late 1970's, Congress increasingly became concerned about reports that as many as half a million SSDI or SSI recipients—some twenty percent of all workers receiving benefits—did not meet eligibility requirements, leading to improper payments of more than $2 billion annually. *See, e.g.,* General Accounting Office Report, *More Diligent Follow-Up Needed to Weed Out Ineligible SSA Disability Beneficiaries* (March 3, 1981). Consequently, § 311(a) of the Amendments, codified at 42

U.S.C. § 421(h)(1), provided for periodic reviews of many beneficiaries:

In any case where an individual is or has been determined to be under a disability, the case shall be reviewed by the applicable State agency or the Secretary (as may be appropriate), for purposes of continuing eligibility, at least once every 3 years ... except where a finding has been made that such disability is permanent, such reviews shall be made at such times as the Secretary determines to be appropriate....[6]

The statute required that these Continuing Disability Investigations ("CDI's") begin in January of 1982. "However, the [Secretary] moved up the date of implementation ..., and accelerated the rate of review.... Beginning in March of 1981, SSA began sending out about three times the normal number of CDI cases: about 160,000 were done in [Fiscal Year] 1981, 496,771 in FY 1982, and 640,000 were budgeted for FY 1983 prior to the Secretary's new initiative to slow down the review process announced in June, 1983." House Report at 10. POMS § DIT 30001 dictates that every person previously found eligible for disability benefits must undergo a CDI every three to seven years if he or she suffers from a permanent disability. Following the reviews, the SSA terminated the benefits of more than 460,000 disability recipients. One-third of those had their benefits restored after administrative appeals; federal courts have ordered reexamination of 100,000 additional cases. In fiscal year 1983, sixty-one percent of the termination decisions appealed to ALJ's were reversed. 130 Cong.Rec. H1956–93 (passim).

BDD has conducted more than 50,000 CDI's in Ohio since the start of the fiscal year 1981. The parties have stipulated that BDD decided to terminate approxi-

---

6. *See* 20 C.F.R. §§ 404.1589, 416.989:

After we find that you are disabled [or blind], we must determine from time to time if you are still eligible for disability cash benefits. We may begin an investigation for this purpose for any number of reasons, including

your failure to follow the provisions of the Social Security Act or these regulations. If our investigation shows that we should suspend payment of your benefits, we will notify you in writing and give you an opportunity to reply....

mately 23,025 of those beneficiaries.[7] Eight hundred and fifty others would have been terminated but for a moratorium ordered by Gov. Richard Celeste. *See* Executive Order 83–52 (Oct. 8, 1983); Executive Order 84–13 (March 15, 1984).

### 3. Judicial Endorsement of the Medical Improvement Standard: The Law in Other Circuits

While the Secretary's interpretation of the administrative burden in disability cases has varied during the thirty years since the SSDI program was initiated, judicial interpretation of the Act has remained consistent. Using different language, ten circuit courts of appeals have held that the Secretary may not terminate disability benefits without offering substantial evidence that the record supporting the initial determination of disability is no longer valid.

The standard imposed by the courts has been called either a "medical improvement standard" or a "presumption of continuing disability". The former position was articulated in *Miranda v. Secretary of Health, Education and Welfare*, 514 F.2d 996, 998 (1st Cir.1975):

> ... And once having found a disability, the Secretary may not terminate the benefits without substantial evidence to justify so doing. This will normally consist of current evidence showing that a claimant has improved to the point of being able to engage in substantial gainful activity; but it might also consist of evi-

dence that the claimant's condition is not as serious as was at first supposed. Having permitted the Secretary to consider medical evidence presented during the original disability determination, the court carefully narrowed the scope of this "second look". "It would be wrong for the Secretary to terminate an earlier finding of disability on no basis other than his reappraisal of the earlier evidence." *Id.* at 998 n. *.

Several courts have read *Miranda* as articulating an explicit "medical improvement" standard and have adopted it as such. *See Cassiday v. Schweiker*, 663 F.2d 745, 749 (7th Cir.1981) ("Given that the evidence continued to show the existence of the same condition, and given that there was no question of improvement but only disagreement about how disabling the condition had ever been, we think Mrs. Cassiday made out a *prima facie* case and the burden had shifted to the Secretary to justify the termination of benefits.");. *Van Natter v. Secretary of Health, Education and Welfare*, No. 79–1439, slip op. at 6–7 (10th Cir. Jan. 8, 1981) (not for routine publication) (adopting *Miranda* standard as "reasonable"). In *Finnegan v. Matthews*, 641 F.2d 1340 (9th Cir.1981), the court reversed the Secretary's decision to terminate benefits and announced that:

> ... [A]bsent a finding of subsequent material medical improvement a recipient must logically still be disabled ... The Secretary may not terminate benefits ab-

---

**7.** The parties stipulated to these figures at the class certification hearing. The stipulation reads in part:

> I. (A) In federal fiscal years 1981, 1982 and 1983, the Ohio Bureau of Disability Determinations (BDD) adjudicated respectively 4,804, 9,812 and 8,288 Ohio residents who had been previously found to be entitled to SSDI and/or SSI disability benefits, who were selected for a Continuing Disability Review and who completed or had completed on their behalf SSA Form 454 F4 or 454 BK, to be no longer disabled.
>
> (B) From October 1, 1983 to February 10, 1984, BDD adjudicated 121 Ohio residents who had been previously found to be entitled to SSDI and/or SSI disability benefits, who were selected for a Continuing Disability Review and who completed or had completed on

their behalf SSA Form 454 F4 or 454 BK, to be no longer disabled.

> II. As a result of the moratorium on the cessation of continuing disability claims ordered by Governor Celeste from October 8, 1983 to March 12, 1984, BDD has evaluated the continuing disability claims of approximately 850 Ohio residents who had been previously found to be entitled to and presently are receiving SSDI and/or SSI disability benefits, and who were selected for a Continuing Disability Review and who completed or had completed on their behalf SSA Form 454 F4 or 454 BK.
>
> Because of the moratorium, BDD has suspended the processing of these claims at the point when it appears adverse decisions (*i.e.*, terminations) will be rendered in them.

sent a showing of previous clear and specific error or medical improvement which is sufficient to establish that an applicant is no longer "continuously disabled as so defined."

\*　　\*　　\*　　\*　　\*　　\*

... Since there has clearly been no material improvement in Finnegan's medical condition or clear and specific error in the prior state proceedings awarding benefits to Finnegan, it was improper for the district court to allow a termination of Finnegan's benefits.

*Id.* at 1345, 1347.

Other circuits have placed the same burden on the Secretary by adopting a "presumption of continuing disability". This standard, articulated tersely in older cases such as *Hall v. Celebrezze*, was first spelled out in *Rivas v. Weinberger*, 475 F.2d 255 (5th Cir.1973). Citing *Hall*, the court announced that "[o]nce evidence has been presented which supports a finding that a given condition exists it is presumed in the absence of proof to the contrary that the condition has remained unchanged." *Id.* at 258.

*Mathews v. Eldridge*, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), did not alter this presumption by imposing on the disability claimant "a continuing burden of showing ... that he has a physical or mental impairment ..." As pointed out in *Patti v. Schweiker*, 669 F.2d 582, 587 (9th Cir.1982), the presumption created by the prior finding of disability "does not affect the [claimant's] ultimate burden of proof. It does, however, impose 'on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption.' Fed.R.Evid. 301." That is, the presumption of continuing disability "impose[s] on the Secretary a burden to come forward with evidence that [the claimant's] condition has changed." *Id.*

The presumption of continuing disability as articulated in cases such as *Rivas* and *Patti* has been widely adopted. *Dotson v. Schweiker*, 719 F.2d 80, 82 (4th Cir.1983); *Crosby v. Schweiker*, 650 F.2d 777 (5th

Cir.1981). Courts frequently have linked the presumption to elemental notions of administrative fairness.

... In reviewing the appeal of an initial disability case, we must consider whether the Secretary's finding of no disability is supported by substantial evidence. However, in light of principles of administrative res judicata, this is not the proper inquiry in a benefits continuation case. We must ascertain whether the Secretary's finding of *improvement* to the point of no disability is supported by substantial evidence. In each case, the burden remains with the claimant to prove the existence of a disability.... If, however, the evidence in a continuation case is substantially the same as the evidence had been in the initial disability benefits request case, benefits must be continued. Otherwise, termination of benefits will often depend not on a finding of changed condition, but simply on the whim of a changed ALJ....

*Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir.1982) (citation omitted) (emphasis in original). *See also Kuzmin v. Schweiker*, 714 F.2d 1233, 1237 (3d Cir.1983) ("[T]he Secretary's prior determination that a particular medical condition has resulted in a statutory disability does implicate administrative consistency.")

Clearly the "medical improvement" and "presumption of continuing disability" standards are substantively identical. Recognizing as much, the Eighth Circuit adopted *Miranda*, a medical improvement case, in support of "the proposition that when evidence of disability does not change, the Secretary shall be bound by its prior determination of disability." *Weber v. Harris*, 640 F.2d 176, 178 (8th Cir.1981). In *Kuzmin v. Schweiker*, 714 F.2d at 1238, the court found *Miranda* and *Simpson*, a presumption case, to apply "a similar approach". Most succinctly, *Trujillo v. Heckler*, 569 F.Supp. 631, 635–36 (D.Colo. 1983), found that "[t]he presumption of disability approach ... accomplishes the same things as an improvement standard ... [and] typically incorporates an improve-

ment standard.... Under either standard benefits may not be terminated without showing that the recipient's medical condition has improved." By whatever name, this is the law in ten circuits.[8]

### 4. Judicial Endorsement of the Medical Improvement Standard in the Sixth Circuit

The Sixth Circuit is one of those circuits. *Hall v. Celebrezze* is one of the earliest cases adopting a "presumption of continuing disability" standard. And *Hayes v. Secretary of Health, Education and Welfare*, 656 F.2d 204 (6th Cir.1981)—an opinion written after the Secretary issued the 1980 regulations—imposed a "medical improvement" standard for the circuit. Reversing administrative and lower court rulings that had terminated the SSI benefits of a 23-year-old mentally retarded woman, the court wrote:

> ... We find that the evidence does not support the conclusion that the termination of Hayes' benefits was proper because her condition had improved.
>
> \* \* \* \* \* \*
>
> ... If at some time in the future the training is found to have been successful and Hayes' condition has improved, the Secretary may of course reevaluate the award in light of the changed circumstances.

*Id.* at 206.

As the Sixth Circuit's only published case dealing with the medical improvement standard, *Hayes* is the governing law for this Court.[9] Moreover, the position stated there was vigorously reaffirmed in two subsequent, unpublished Sixth Circuit opinions. *Burnett v. Secretary of Health and Human Services*, 703 F.2d 559 (6th Cir.

1982), reversed the Secretary's decision to terminate Burnett's benefits because no showing had been made to satisfy the test of *Miranda* and *Weber v. Harris:*

> ... In termination cases, the Secretary bears the burden of proving either: (1) that the claimant's condition has improved since the initial award of benefits; or (2) that the claimant's condition is not as serious as first supposed. *See* 20 C.F.R. 404.1539(a)(1); *Miranda v. Secretary, ...; Weber v. Harris....*
>
> In the present matter the Secretary failed to introduce evidence which supports either proposition. There is nothing whatsoever in the record to indicate that Mr. Burnett's health has improved since 1976 ...

A second case, *Hall v. Secretary of Health and Human Services*, 711 F.2d 1056 (6th Cir.1983), utilized the presumption of continuing disability standard. Citing *Patti*, it held that an initial grant of benefits

> ... places the burden of producing evidence to rebut the presumption on the Secretary. *Patti.* That is, the Secretary must produce evidence of improvement in the claimant's condition.

The law of the Sixth Circuit is clear: no recipient of SSDI or SSI disability benefits may be denied those payments unless the Secretary produces substantial evidence demonstrating that the recipient is no longer disabled within the meaning of the law.

Notwithstanding these rulings, the Secretary has not applied *Hayes* to any other disability terminations; rather, she has continued to instruct BDD and the ALJ's to follow SSA's regulations and internal procedures, mandating a current disability standard. *See* Part II–B–2, *supra.* As the Associate Commissioner for Hearings and

---

**8.** The Second Circuit has recently reemphasized the claimant's "burden to prove the continued existence of a disability." *Delamater v. Schweiker*, 721 F.2d 50, 54 & n. 5 (2d Cir.1983), but has neither rejected nor adopted the medical improvement standard, an issue which "remain[s] for another day." *Wheeler v. Heckler*, 724 F.2d 262, 263 (2d Cir.1983).

No available opinion sets forth the views of the District of Columbia Circuit on this question.

**9.** *Hayes* has been cited by other courts as the Sixth Circuit's rule of law adopting the medical improvement standard. *See Kuzmin v. Schweiker*, 714 F.2d at 1238; *Trujillo v. Heckler*, 569 F.Supp. at 634; *Siedlecki v. Schweiker*, 563 F.Supp. 43, 47 (W.D.Wash.1983).

Appeals stated in a memorandum to ALJ's in January of 1982:

The Federal courts do not run SSA's programs, and [SSA's adjudicators] are responsible for applying the Secretary's policies and guidelines regardless of court decisions below the level of the Supreme Court.

House Report at 24. *See also* 6 OHA Law Reporter No. 1 at 27 (January, 1982) ("[I]f a district or circuit court's decision contains interpretations of the law, regulations, or rulings which are inconsistent with the Secretary's interpretations, the administrative law judge should follow the Secretary's interpretations.") Her position is that the legal principles enunciated by the Sixth Circuit in *Hayes* apply only to the parties in that case.

## III. THE NAMED PLAINTIFFS AND CLASS MEMBERS

In their pleadings and through testimony and exhibits at the class certification and preliminary injunction hearings, the plaintiffs presented considerable information about the impact of the Secretary's policies on the named plaintiffs, on specific class members, and on the proposed class as a whole.

### A. *Named Plaintiffs*

The allegations of the five named plaintiffs in these two actions—Gerald Brest, Norma Holden, Willie Baker, Edward Grant, and Larry McGinty—are set forth in their complaints and in the affidavits they submitted at the hearing.

### 1. Gerald Brest

Gerald Brest is thirty-seven years old and lives in Boardman, Ohio, near Youngstown. He received a shrapnel wound to his head while fighting in Vietnam in 1967. In 1969 he underwent surgery to clamp a ruptured artery in his brain; following the operation, he suffered a stroke that temporarily left him partially paralyzed. A piece of shrapnel remains lodged in the sinus cavity of the right hemisphere of Brest's brain. Brest claims that since being wounded he has suffered from severe head pain and headaches, which are aggravated by sunlight, heat, and noise; has suffered from the side effects induced by the medications he must take to combat the pain; is unable to stand, sit or walk for any reasonable time; and cannot bend over without becoming dizzy.

An ALJ awarded Brest SSDI benefits in 1974, finding him disabled for a period beginning in June of 1969. In April of 1982, BDD informed him that it was reviewing his case and asked him to provide evidence of his current medical status. Brest responded by completing and submitting Form SSA 454 F4, in which he set forth descriptions of his ailments and symptoms. He also submitted letters by two doctors. The BDD referred him to a Robert Gilliland, M.D. Brest was examined by the doctor on August 25, 1982; he claims that the entire examination lasted less than ten minutes and that the doctor spent most of that time asking questions. The following day, Gilliland sent a report to BDD.

On September 7, 1982, the SSA wrote to Brest to inform him that it had determined he had possessed "the ability to engage in substantial gainful activity since September, 1982." The letter did not state any conclusion that Brest's medical condition had actually improved. Although he submitted additional medical evidence, Brest's request for reconsideration was denied on January 20, 1983. He later was denied reinstatement of benefits by an ALJ and the Appeals Council. In his August 5, 1983 opinion, the ALJ found that Brest's disability had ceased on September 1, 1982, but made no finding that Brest's medical condition had improved.

Brest states that none of his medical problems have improved since he was first found to be disabled and that, in particular, his headaches have continued unabated. Since his benefits ceased, Brest has, by his account, incurred $6,000 in debts which he is unable to repay, been forced to borrow from his parents and in-laws to pay for basic necessities, and suffered emotional trauma.

## 2. Norma Holden

Norma Holden is fifty-eight years old and lives in Cleveland. Prior to 1977, she worked as a keypunch operator. Because of worsening arthritis and hypertension, she applied for SSDI benefits in May of 1979 and was found disabled by an ALJ.

BDD notified her in October of 1982 that it was reviewing her case. Like Brest, she completed a questionnaire and signed medical release forms. She does not state whether she was examined by a BDD-affiliated doctor. On January 3, 1983, BDD informed her that her disability had concluded and that her benefits would end in March. In March and April, she received two formal termination notices from SSA. Holden claims that neither notice stated that her condition had improved. She received an unfavorable decision from an ALJ on November 28, 1983 and received her last check in December. She awaits a decision from the Appeals Council.

Holden contends that her medical condition has not improved but actually worsened. Specifically, she stated that because of the arthritis: 1) her knees have deteriorated, causing her to fall several times, once breaking her ankle; 2) her hand hurts and swells, preventing her from sleeping; and 3) her back has become painful. In addition, she states that she has developed diabetes; among the symptoms related to that affliction are swollen gums and unusual sensations in her right eye.

Until December, Holden received $377 per month in SSDI payments and was covered by Medicare. Having been terminated from both programs, her only income is $130 per month from a tenant who lives in the house Holden bought in 1971. This sum does not cover her expenses but renders her ineligible for the State's General Relief ("GR") welfare program. Her description of her present medical and financial position is frightening: she is eight months behind on mortgage payments on her house and is threatened with foreclosure; she has received termination notices from the electric and gas utilities; her telephone has been disconnected. Holden stated that she borrows from friends to pay for the basic necessities of life, has been unable to go to a doctor since Medicare coverage stopped in December, and has been unable to pay for the blood sugar tests recommended for diabetics.

## 3. Willie Baker

Willie Baker is forty-eight, also lives in Cleveland, and supports six children. In February of 1970, Baker was found to be disabled as of October 20, 1969 because of chronic low back pain and tuberculosis-related breathing difficulties. For fourteen years after that decision, Baker received SSDI benefits.

BDD commenced a review of his case in January of 1983. Baker completed questionnaires informing the Bureau that his medical condition had not improved and that he was unable to work. On April 26, 1983, BDD ruled that Baker was able to work as of April of 1983. His request for reconsideration was turned down on July 14, 1983. After a hearing, the ALJ ruled that Baker was no longer disabled. His checks stopped in January of this year. On January 25, the Appeals Council denied his request for review.

Baker states that his medical condition has not improved and that he suffers from shortness of breath, back injuries, tuberculosis and hypertension, leaving him unable to hold employment. His only current source of income is $600 per month received from the Ohio Bureau of Workers Compensation. Baker states that he is behind in paying his monthly rent of $150 and is also $300 behind in paying for monthly treatments by his doctor. He claims that his doctor will not see him again until he pays his bills.

## 4. Edward Grant

Edward Grant is sixty-three and also lives in Cleveland. He states that he was forced to leave his job in a steel foundry in 1975 because of arthritis, a condition which also forced him to abandon a subsequent career as a security guard. He was later

found to have been disabled since June 1, 1975 and awarded SSDI benefits. When BDD commenced a review in September of 1981, Grant filled out the appropriate forms informing the Bureau that his arthritic condition had not improved. In November, BDD informed him that he was able to work and ineligible for SSDI benefits. Grant's request for reconsideration was denied in March of 1982; he received an adverse decision from an ALJ in September of 1982, and the Appeals Council denied his request for review on December 18, 1983.

Grant states that since January of 1982 he has supported four children each month on $393 in payments from the Aid to Families with Dependent Children ("AFDC") program, $196 in food stamps, and $50 from a boarder. Each month Grant must borrow money from a friend to buy food for his children—aged fifteen, fourteen, thirteen, and nine—whom he has raised alone since his wife died in December of 1982. He owes more than $1,000 in utility bills. Grant states that, because of the children's expenses, he worries constantly about not being able to keep up with the bills. A particularly difficult period, he claims, was the interim between the cut-off of his disability benefits and the start of AFDC payments, when he had no source of income at all.

### 5. Larry McGinty

The final named plaintiff, Larry McGinty, represents class members who pursue this action because they believe the administrative review process now in effect will not consider their claims under the proper legal standard. McGinty was awarded SSDI benefits in 1974 or 1975 because of a kidney disorder, an ulcer, and hypertension. His case came up for review in the fall of 1982. Like the other named plaintiffs, McGinty filled out a disability questionnaire and signed medical release forms. He informed BDD that his condition had not improved and that he could not work, and signed the required SSA forms and medical releases. SSA found him to be no longer disabled and terminated his check in December of 1982; his request for reconsideration was denied. However, his benefits were restored pending appeal to an ALJ under the terms of the Federal Supplemental Compensation Act of 1982.[10]

In his March 20, 1984 affidavit, McGinty states that he was scheduled for a hearing before an ALJ on March 28. He became a plaintiff in this action prior to that hearing "because Social Security will not consider whether my medical condition has improved."

### B. *Other Class Members*

Three members of the tentatively certified class testified at the preliminary injunction hearing and a dozen others submitted affidavits.

Luvenia Chatman testified that she injured her shoulder and spine while working as a cook at Stouffer's in 1970. Since then she has suffered from a number of ailments. In October of 1982 she underwent open heart surgery following a heart attack; in 1983 she was hospitalized five or six times for chest pains, urinary infections, and other medical problems. She has already been hospitalized once in 1984.

Chatman testified that she received a letter from BDD in June of 1983—while she was in the hospital—instructing her that her case was being reviewed and that she should appear for an appointment with a doctor. Following the appointment, her disability benefits of $258.00 per month and her Medicare coverage were terminated. Because of the loss of benefits, Chatman stated that she is unable to receive any further treatment by her cardiologist, to whom she owes $1,300, and is unable to receive treatment for her back problems. In addition, the termination induced a nerv-

---

**10.** Pub.L. 97–455, 96 Stat. 2497 (Jan. 12, 1983) and Pub.L. 98–118, 97 Stat. 803 (Oct. 11, 1983) together provided that SSDI recipients who received negative initial decisions after January 12, 1983 and before December 7, 1983 and filed timely appeals could, at their option, continue to receive interim benefits pending a decision by the ALJ.

ous rash and left her unable to sleep because she is so worried about her financial situation. Her hospital bill has been turned over to a collection agency.

Mary Louise Utz is a forty-seven-year-old former registered nurse with two daughters aged twenty-one and nineteen. After being graduated from college in 1957, she worked as a nurse until 1965 or 1966, when severe back pain forced her to leave work. She was awarded SSDI benefits. Utz testified that she suffers from severe back pains, and it is obvious that her left leg drags when she walks, and that even with the aid of a cumbersome brace she cannot sit, stand, or walk with any comfort. She testified that her condition has worsened, not improved, over the past two decades: she has had a total of seven operations (several on her back as well as a mastectomy) and must ingest muscle relaxants and receive frequent heat and massage treatments to alleviate her back pains.

On April 29, 1982, BDD informed her that her medical conditions would not prevent her from working, and that her disability benefits and medical insurance would be terminated in June. After losing the benefits, she developed a nervous condition, bleeding in the stomach and rectum, stomach pains, and a condition later diagnosed as stress diabetes. In 1983, after a hearing before an ALJ in Pittsburgh, Utz' benefits were reinstated immediately and retroactively. However, attorney's fees of $1,155.00 were withheld from the check she received. Despite her reinstatement, under doctor's instructions she has continued to take Elevil, a prescription anti-depressant.

The third class member to testify, Georgia Lloyd, first injured herself while working at the IRC Fibers factory in Painesville in 1971. After surgery to repair a herniated disc, Lloyd returned to work but developed tendonitis in her arms and was advised by doctors to find other, less strenuous work. Following their advice, she worked as a waitress, bartender, and then again as a factory employee. In 1976 she hurt her back again and underwent a second operation. She was awarded SSDI benefits in 1978.

Lloyd's benefits were terminated in June of 1979. She testified that at that time her medical condition had not improved, and that she continued to suffer from arthritis and hypertension. After being terminated, Lloyd subsisted on GR payments of $100 per month plus food stamps. Formerly able to keep her "head above water" financially thanks to the disability payments, Lloyd thereafter met her living expenses only by selling all her possessions, even the registered beagles she had raised "like part of the family." She and her mother were forced to sell their home in Turnbull Township; Lloyd moved into a low-income housing project in Ashtabula.

In addition to her financial woes, Lloyd suffered emotional anguish after her termination. Describing herself as a strong, friendly, outdoors-oriented person, Lloyd said she was traumatized by having to go to the welfare office each month and became increasingly unfriendly to those around her. At her lowest point, Lloyd said, she contemplated suicide. In 1980 her appeal was successful and her benefits were reinstated. Like Utz, Lloyd received retroactive payments minus the considerable sum withheld to pay her attorney's fees.

In an affidavit, John Janosek, a former soldier and police officer stated that he had received mental disability benefits for chronic brain syndrome caused by an aneurism, a stroke and cerebral hemorrhage he suffered in 1974. His speech and body movements are impaired. BDD began to review his case in February of 1982 and that September found him to be no longer disabled. Unable to support himself and his two children, Janosek became extremely distressed and considered suicide. He was referred to a psychiatrist, Dr. Kathleen Quinn, who referred him for emergency treatment and testified that the termination was a significant cause of Janosek's

worsened medical condition. After running up $3,000 in unpaid medical bills and being hospitalized for a week for medical and neurological problems, Janosek finally had his benefits restored by an ALJ in May of 1983.

Similarly, Barbara Williams became so nervous and upset after being informed of her CDI review that she contemplated suicide and was admitted to a state mental hospital. There she received word from SSI that her benefits were being terminated. An ALJ later found her to be disabled. Affiants Margaret Schroeder, Jane Meding, and Helen Gordon set forth similar tales of family members who became extremely depressed, withdrawn, tired, stressed and inconsolable after learning that their benefits were being terminated or considered for termination. In each case the relative died. In the case of Meding's father, Ralph Grunau, an ALJ finally found him to be still disabled—a month and a half after his death. ·

The affiants' descriptions of their financial problems resembled the testimony given by Chatman, Utz and Lloyd. Pat Blake, William Wood, Lillie Burnett, James Stallman, Dorothy Tolliver and Raymond A. Busby, Jr., repeat similar histories: since losing their disability benefits, they have had their utilities cut off, lost their homes and cars to repossession, been forced to sell their possessions, been harassed by bill collectors, and been unable to afford essential medication, food, visits to doctors, and the bare necessities of life.

## C. Statistical Testimony Concerning All Disability Terminations

As discussed in Part II–B–3, *supra*, more than 23,000 individuals have lost their disability benefits in Ohio since the start of fiscal year 1981. The plaintiffs presented testimony from Linda Craft, BDD's assistant director of operations, concerning a study which she had supervised, and which demonstrated that a large proportion of those terminations would not have taken place had BDD applied a medical improvement standard while conducting the CDI reviews. Craft stated that BDD randomly selected 165 case files from approximately 900 cases in which a decision to terminate benefits has been made but not implemented because of Governor Celeste's moratorium on terminations. Six senior staff members—all of whom had once been claims examiners—applied a "common sense approach to medical improvement" and determined that fifty-seven of the 165 recipients would continue to receive benefits if a medical improvement standard were applied.[11]

In a deposition admitted in evidence, BDD director Herman stated that the rate of terminations was low when the medical improvement standard was applied in the 1960's, rose significantly when SSA switched to the current disability standard in 1976, and could probably drop by eighty percent if the medical improvement standard were reinstated.[12]

## IV. JURISDICTION

The plaintiffs allege federal subject matter jurisdiction under 42 U.S.C. §§ 405(g)

---

11. The 165 cases included fifty-one "diaried" cases (disabilities believed to be of short-term duration) and 114 "periodic" cases (which are reviewed every three to seven years). Plaintiffs argue that if the pool had included only periodic cases, which typically involve more severe, permanent injuries, the percentage of terminations which would be avoided by application of a medical improvement standard would be considerably higher.

12. During Herman's deposition, reference was made to his November 22, 1983 appearance before the Governor's Task Force on Continuing Disability Investigations. At that hearing, Herman reviewed the varying standards applied by BDD and its predecessor since 1956. He states that from "the early sixties, through 1981[,] only these claims scheduled on the basis of the likelihood of improvement were subject to continuing disability review." He added:

For a period of approximately five years in the late 70's, the Social Security Administration used criteria that required that a person have medically improved from what his condition was at the time disability was granted before a termination of benefits could be found. During this time, the rate of terminations significantly dropped in fact the drop nearly was by 80 percent.

and 1383(c)(3); [13] 28 U.S.C. §§ 1331, 1361, 2201 and 2202; and 5 U.S.C. § 702. The Secretary contends that § 405(g) is the only possible basis of jurisdiction over any of the claims at issue and that even that statute does not provide jurisdiction over many members of the proposed class. This Court concludes that it possesses jurisdiction over the tentatively certified class and the State of Ohio under 42 U.S.C. § 405(g) and 28 U.S.C. § 1361; the applicability of other jurisdictional statutes need not be decided.·

### A. *42 U.S.C. § 405(g)*

The Act provides for federal district court review of determinations by the Secretary that a claimant's disability has ceased and that his or her benefits should be terminated. Title 42 U.S.C. § 405(g) provides in part:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such determination by a civil action commenced within sixty days after the mailing to him of notice of such decision .... The Court shall have the power to enter, upon the pleading and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing....

The literal language of the section specifies three requirements for judicial review: (1) the final decision of the Secretary after a hearing; (2) commencement of a civil action within sixty days after the mailing of the notice of the decision, or within such times as otherwise provided; and (3) filing of the action in an appropriate district court.

While the requirement of a final decision by the Secretary is "central to the requisite grant of subject-matter jurisdiction", *Wein-*

*berger v. Salfi*, 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975),

> ... this condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary.

*Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976). The plaintiffs contend that all members of the proposed class satisfy both prongs of the test.

### 1. Presentation

■ The requirement that individuals present a claim for benefits before a federal court has jurisdiction over them has been read to require "some decision by the Secretary". *Id.* In *Weinberger v. Salfi*, the court distinguished between the district court's jurisdiction over named plaintiffs in a class action who had "fully presented their claims for benefits 'to their district Social Security Office and, upon denial, to the Regional Office for reconsideration' " and its lack of jurisdiction over class members about whom the complaint "contain[ed] no allegation that they have even filed an application with the Secretary...." 422 U.S. at 764–65, 95 S.Ct. at 2466–67.

*Mathews v. Eldridge* expanded the first portion of *Salfi* and held that the plaintiff had satisfied the presentation requirement when

> [t]hrough his answers to the state agency questionnaire, and his letter in response to the tentative determination that his disability had ceased, he specifically presented his claim that his bene-

---

**13.** 42 U.S.C. § 405(g) governs judicial review of SSDI terminations. Section 1383(c)(3) governs review of SSI terminations and provides:

"The final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Secretary's final determination under section 405 of this title." All references to § 405(g) shall be read to include § 1383(c)(3) as well.

fits should not be terminated because he was still disabled.

424 U.S. at 329, 96 S.Ct. at 900.

Interpreting *Eldridge*, numerous courts have held that the presentation requirement is satisfied in Social Security class actions where "all claimants were benefit recipients whose benefits had been reduced or terminated." *Kuehner v. Schweiker*, 717 F.2d 813, 817 (3d Cir.1983); *Liberty Alliance of the Blind v. Califano*, 568 F.2d 333, 344 (3d Cir.1977); *Ellison v. Califano*, 546 F.2d 1162, 1164 (5th Cir.1977); *Wilson v. Edelman*, 542 F.2d 1260, 1270–71 (7th Cir.1976); *Lopez v. Heckler*, 725 F.2d 1489 (9th Cir.1984) ("*Lopez II*") ("These decisions seem eminently sensible."). At a minimum, "in the case of someone who had been receiving benefits and was terminated, [§ 405(g) merely] requires notification to the agency that the claimant still asserts disability." *Mental Health Association of Minnesota v. Heckler*, 720 F.2d at 969, citing *Mathews v. Diaz*, 426 U.S. 67, 72, 76, 96 S.Ct. 1883, 1887, 1889, 48 L.Ed.2d 478 (1976) (jurisdiction extended to claimant who had filed application after the case had been filed); *City of New York v. Heckler*, 578 F.Supp. 1109, 1117 (E.D.N.Y.1984) (recipients informed of benefit termination satisfied presentment requirement by returning questionnaire to SSA); *cf. Wheeler v. Heckler*, 719 F.2d 595, 599–600 (2d Cir. 1983) (presentation requirement held not satisfied because "plaintiffs presented no allegations that the unnamed plaintiffs had initiated even informal communications with SSA or [the affiliated state agency], either prior or subsequent to receipt of a termination notice.") Since the tentatively certified class in this case includes only those Ohio SSDI and SSI beneficiaries "who have been or are receiving disability benefits and who have presented or will present a claim to the defendants that their disabilities have continued", every class member has satisfied the presentation requirement under § 405(g).

**2. Exhaustion**

In *Weinberger v. Salfi*, Justice Rehnquist explained the rationale for administrative exhaustion requirements:

> ... Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise and to compile a record which is adequate for judicial review.

422 U.S. at 765, 95 S.Ct. at 2466.

The *Salfi* Court also recognized, however, that in certain instances courts could themselves waive the requirement and entertain challenges to the Secretary's actions when further administrative action would be "futile":

> ... Once a benefit applicant has presented his or her claim at a sufficiently high level of review to satisfy the Secretary's administrative needs, further exhaustion would not merely be futile for the applicant, but would also be a commitment of administrative resources unsupported by any administrative or judicial interest.

*Id.* 422 U.S. 765–66, 95 S.Ct. at 2466–67.

A year later, in *Mathews v. Eldridge*, the Court read *Salfi* to stand for the proposition that "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." 424 U.S. at 330, 96 S.Ct. at 900. One such situation is when the plaintiff's statutory or constitutional claim "is entirely collateral to his substantive claim of entitlement [to benefits]." *Id.*[14] Another

---

**14.** Decisions in different contexts have emphasized that the nature of the claim being asserted and the consequences of deferment of judicial review are important factors in determining whether a statutory requirement of finality has been satisfied ... But [regardless of the context] the core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered remains applicable. *Id.* 424 U.S. at 330, 331 n. 11, 96 S.Ct. at 900 n. 11.

is where "full relief cannot be obtained at a post-deprivation hearing"—that is, where retroactive benefits awarded at a judicial hearing following complete exhaustion would afford inadequate compensation. *Id.* The present case satisfies the requirements for judicial waiver of the Secretary's exhaustion requirements.

### a. Collaterality

■ The Secretary argues that the class members' contention that the medical improvement standard must be applied to their cases "goes to the very heart of the merits of their substantive claims for disability benefits" and is not a collateral issue meriting exhaustion. Post-Hearing Brief at 20. In fact, the claims are collateral, for they are by no means confined to a direct claim for the payment of benefits. Rather, the principal relief sought is an order that in conducting disability benefit terminations the Secretary must apply the medical improvement standard adopted by this circuit in *Hayes.* In ruling on the merits of their legal claim, this Court would not be evaluating their underlying claim for benefits but only the procedures by which such determinations have been and will be made by BDD and SSA. As Judge McMillan has noted:

> ... Of course, plaintiffs' claims are generated from a belief that benefits would be awarded to them if SSA were to apply lawful standards to the review of their cases. Nevertheless, that fact does not convert their suit into a direct claim for benefits, in which the court would be asked to review the record of each individual case to determine whether the Secretary's decision is supported by substantial evidence. In *Mathews v. Eldridge, supra,* the Supreme Court held that a plaintiff's due process claim to a pre-deprivation hearing was collateral to a substantive claim for benefits. 424 U.S. at 330 [96 S.Ct. at 900]. That the plaintiff in *Eldridge* hoped ultimately to have his benefits reinstated did not affect the court's decision concerning the essential nature of his claim.

*Hyatt v. Heckler,* 579 F.Supp. 985, 997–98 (W.D.N.C.1984). Other courts have treated the Secretary's argument similarly. *See Lopez II,* 725 F.2d at 1502. ("If plaintiffs are regarded only as vindicating once again the right that this court has already held in *Patti* and *Finnegan* they are entitled to, then the claim is just as collateral to the substantive claim for benefits as was Eldridge's."); *Kuehner v. Schweiker,* 717 F.2d at 818 ("the plaintiffs in effect charge that the Social Security Administration has for budgetary reasons instructed those responsible for termination adjudications to disregard definitive interpretations of the Act made by the courts.").

The Sixth Circuit enunciated a similar position on the collaterality question in *Blankenship v. Secretary of Health, Education and Welfare,* 587 F.2d 329 (6th Cir. 1978). In *Blankenship,* the district court certified a class of Kentucky plaintiffs seeking SSDI and SSI benefits who had experienced delays of more than thirty days in obtaining a hearing. Rejecting the argument that the trial court lacked jurisdiction over members of the class who had not exhausted their administrative and judicial appeals, the court of appeals stated:

> ... The plaintiffs' claim does not pertain to their entitlement to benefits, but it arose in the context of a request for benefits, and it was raised only after the plaintiffs applied for benefits and received an unfavorable decision.

*Id.* at 332.

The plaintiffs allege a collateral question which provides this Court with subject matter jurisdiction over the class.

### b. Substantial Hardship and Irreparable Harm

■ The Secretary also contends that waiver of exhaustion requirements is inappropriate because the application of an incorrect legal standard to terminate any individual recipient's disability benefits can be remedied by administrative appeals or by the District Court, after which full retroactive benefits may be awarded. The testimony and affidavits of many class

members, especially plaintiffs Utz and Lloyd, refute this argument. Most members of the plaintiff class are entirely dependent upon public assistance. When their disability benefits were terminated, they and their dependents often went without proper food, shelter and medical treatment. In some cases, actual or threatened termination of benefits induced severe stress that apparently caused medical setbacks, hospitalization, and conceivably death. No later lump sum payment can redress these forms of deprivation. Moreover, the Secretary's argument ignores the "irreparable harm inherent in the pursuit of administrative relief ..." *Mental Health Association of Minnesota v. Heckler*, 720 F.2d at 970. The review process is slow, it is stressful, and, from the evidence presented, it is conducted according to an incorrect legal standard until an appeal reaches the district court. Even if the claimant succeeds there, he or she is not made whole—as Utz and Lloyd testified, the price of a successful appeal to district court is often a hefty payment to an attorney, pursuant to 42 U.S.C. § 406(b)(1).

c. Futility

█ Finally, this is a case where "deference to the agency's judgment is inappropriate" because the Secretary has taken a fixed, final, and unyielding position that she will not abide by the law of this circuit as set forth in *Hayes. See* Part II–B–2, *supra.* In such a situation, exhaustion serves no purpose. The Secretary relies on *Smith v. Schweiker*, 709 F.2d 777, 780 (2d Cir.1983), for its statement that "[e]xhaustion ... would frame the issue in a much clearer fashion than is possible when it is posed as an abstraction." This case does not involve an abstraction. It involves a clear policy enunciated by the Secretary in numerous directives.

"Under these circumstances, exhaustion of administrative remedies becomes a mere exercise in futility, both for the claimants and for the courts. It makes far more sense to allow the claimant to litigate the case and, if successful, to obtain a decree enforceable via contempt proceedings." *Kuehner v. Schweiker*, 717 F.2d at 824 (Becker, J., concurring). As in *Blankenship*, "[t]his is not a case where taking jurisdiction would circumvent 'an orderly administrative mechanism' or contravene a congressional policy ..." 587 F.2d at 332 (citation omitted).

Accordingly, this Court finds that the plaintiff class has satisfied the presentation and exhaustion requirements of 42 U.S.C. § 405(g). Furthermore, insofar as they raise constitutional as well as statutory issues, there is no exhaustion requirement. *Mathews v. Eldridge*, 424 U.S. at 330, 96 S.Ct. at 900; *Kuehner v. Schweiker*, 717 F.2d at 817; *cf. Tatum v. Mathews*, 541 F.2d 161, 164 (6th Cir.1976).[15]

3. *Sixty-Day Requirement*

█ The Secretary also contends that, whatever its jurisdiction over other class members, this Court lacks jurisdiction over claimants who: 1) failed to seek administrative review of adverse initial termination decisions within sixty days; 2) failed to seek further administrative review of adverse decisions by an examiner on a request for reconsideration, or by an ALJ; or 3) failed to seek judicial review within sixty days after exhausting their administrative remedies. But the sixty-day requirement is not jurisdictional, *Weinberger v. Salfi*, 422 U.S. at 764, 95 S.Ct. at 2466, and is subject to waiver by the Court. For the same reasons the exhaustion requirement is waived for class members who did not literally satisfy it, the sixty-day requirement is waived as well. *Lopez II*, 725 F.2d at

**15.** In *Heckler v. Lopez*, —— U.S. ——, 104 S.Ct. 10, 15, 77 L.Ed.2d 1431 (1983), Circuit Justice Rehnquist stayed portions of the district court's injunction pending an appeal on the merits and stated: "I am not persuaded that just because respondents put the label 'constitutional' on their claim they fit within the language of our opinion in *Mathews.*" As the Ninth Circuit later noted, neither Justice Rehnquist's language nor the refusal of the full Court to overturn the stay, —— U.S. ——, 104 S.Ct. 221, 78 L.Ed.2d 217 (1983), constitutes a definitive Supreme Court modification of *Mathews v. Eldridge. See Lopez II*, 725 F.2d at 1499 n. 6.

1504–07. Moreover, the sixty-day limitation is inapplicable insofar as jurisdiction rests on the mandamus statute, *City of New York v. Heckler*, 578 F.Supp. at 1119; *Kennedy v. Harris*, 87 F.R.D. 372, 376–77 (S.D.Cal.1980), and insofar as the class raises legitimate constitutional claims. *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977).

### B. *28 U.S.C. § 1361*

■ Title 28 U.S.C. § 1361 provides in full:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

In three separate cases, the Supreme Court has refused to determine whether 42 U.S.C. § 405(h),[16] which channels all suits involving SSA procedures through § 405(g), preempts mandamus jurisdiction. *Califano v. Yamasaki*, 442 U.S. 682, 697–98, 99 S.Ct. 2545, 2555–56, 61 L.Ed.2d 176 (1979); *Norton v. Mathews*, 427 U.S. 524, 529–30, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976), *Mathews v. Eldridge*, 424 U.S. at 332 n. 12, 96 S.Ct. at 901 n. 12. Since those cases, several courts of appeals have answered the question in the negative and permitted jurisdiction to rest on § 1361. *See Ellis v. Blum*, 643 F.2d 68, 78–82 (2d Cir.1981); *Ringer v. Schweicker*, 697 F.2d 1291 (9th Cir.1982), *cert. granted sub nom. Heckler v. Ringer*, — U.S. —, 103 S.Ct. 3535, 77 L.Ed.2d 1386 (1983); *Mental Health Association of Minnesota v. Heckler*, 720 F.2d at 971 n. 17 (and cases cited

therein); *Kuehner v. Schweicker*, 717 F.2d at 819 (majority opinion); *Id.* at 825–28 (Becker, J., concurring); *Graham v. Heckler*, 573 F.Supp. 1573 (N.D.W.Va.1983).

Traditional principles of mandamus require the existence of a "clear right" owed by the defendant agency or official to the plaintiff. The statute has been read to incorporate the common law requirements for granting mandamus: (1) that the plaintiff have a plain right to have the act performed; (2) that the defendant have a plain duty to perform it, and (3) that there is no other adequate remedy available to the plaintiff. 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, *Moore's Federal Practice* ¶ 0.62[17] (2d ed. 1983). Here plaintiffs assert that the Sixth Circuit's interpretation of the Act in *Hayes* provides them with a clear right to have their eligibility for benefits determined in accordance with the "medical improvement" standard. They allege that the Secretary's regulations and actions deprive them of that right. And they have demonstrated that the administrative review mechanisms do not provide an adequate remedy. Since mandamus jurisdiction is clearly proper to challenge the Secretary's failure to follow the law—to perform her "mandatory or ministerial function", *Short v. Murphy*, 512 F.2d 374, 377 (6th Cir.1975)—28 U.S.C. § 1361 clearly provides an alternative basis of jurisdiction in this case. *Lopez v. Heckler*, 725 F.2d at 1507–08; *City of New York v. Heckler*, 578 F.Supp. at 1118–19.[17]

### C. *Other Jurisdictional Statutes*

Since this Court clearly has jurisdiction over the Secretary under 42 U.S.C. §§ 405(g) and under 28 U.S.C. § 1361, it

---

**16.** Title 42 U.S.C. § 405(h) provides in pertinent part:

> No action against the United States, the Secretary, or any officer or employee thereof shall be brought under sections 1331 or 1346 of Title 28 to recover on any claim arising under this chapter.

**17.** This Court also reads the Sixth Circuit's *Blankenship* opinion to have approved, *sub silentio*, the use of mandamus jurisdiction in social security class actions. After finding that § 405(g) provided the district court with juris-

diction over the class discussed above, the court of appeals wrote that:

> In light of this conclusion we find no need to reach the remaining contentions of the plaintiffs that 28 U.S.C. § 1361 and 28 U.S.C. § 1331 also provide jurisdiction. We note only that a number of courts in similar cases have found that, in the absence of any other adequate remedy, 28 U.S.C. § 1361 provides a basis for jurisdiction. *See, e.g., Caswell v. Califano* [583 F.2d 9,] ... 13 n. 8 [ (1st Cir. 1978) ] and cases cited therein.

587 F.2d at 332.

need not address whether the plaintiffs can raise their constitutional claims under 28 U.S.C. § 1331 or seek review of her policies under 5 U.S.C. § 702. *But see Mental Health Association of Minnesota v. Heckler,* 720 F.2d at 769 n. 10 (and cases cited therein). As for 28 U.S.C. §§ 2201 and 2202, they provide no independent basis of subject matter jurisdiction for a federal court. *Franchise Tax Board v. Construction Laborers Vacation Trust,* — U.S. —, 103 S.Ct. 2841, 2850, 77 L.Ed.2d 420 (1983) ("the Declaratory Judgment Act was intended to affect only the remedies available in a federal district court, not the court's jurisdiction..."), citing *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *City of Saginaw v. Service Employees International Union, Local 446–M,* 720 F.2d 459, 461 (6th Cir.1983).

## D. *Jurisdiction Over Claims by the State of Ohio*

In its Complaint in Intervention, the State of Ohio proclaims that it has joined this lawsuit as *parens patriae* for its disabled citizens and to redress the damage the Secretary's actions have inflicted and will inflict on the state treasury.[18] In her Memorandum in Support of Motion to Dismiss, the Secretary repeats the unpersuasive jurisdictional arguments she made against the original plaintiffs. She further contends that the state lacks standing to intervene and fails to state a claim upon which relief can be granted. This Court remains convinced that the State is a proper plaintiff in intervention under Fed.R. Civ.P. 24(b).

### 1. Standing

#### a. *Parens Patriae*

■ To maintain a *parens patriae* action on behalf of its citizens, "the State must articulate an interest apart from the interests of the particular private parties, *i.e.,* the State must be more than a nominal party. The State must express a quasi-sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982) ("*Snapp* "). Such interests include "the health and well-being—both physical and economic—of its residents in general" and "not being discriminatorily denied its rightful status within the federal system." *Id.* Ohio contends the former interest is implicated in this case. Thousands of residents were improperly deprived of disability benefits, the State charges, and other citizens were injured when disabled citizens sought assistance under state welfare programs, driving up the cost of those programs and forcing reductions in other essential state services.

■ The State is not barred from bringing this action merely because it serves as an agent of the federal government in administering the disability programs. *See Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160–61, 102 S.Ct. 205, 212–13, 70 L.Ed.2d 309 (1982). The Secretary argues, however, that "[a] state does not have standing as *parens patriae* to bring an action against the federal government. *Massachusetts v. Mellon,* 262 U.S. 447 [43 S.Ct. 597, 67 L.Ed. 1078] ... (1923)." *Snapp,* 458 U.S. at 610 n. 16, 102 S.Ct. at 3270 n. 16. But the *Snapp* dicta and the holding in *Mellon* do no more than reject the possibility "that a state, as *parens patriae,* may institute judicial proceedings to protect citizens of the United States from the enforcement of the statutes thereof." 262 U.S. at 485, 43 S.Ct. at 600. Neither case barred the State of

---

**18.** Paragraph 5 of the Complaint in Intervention states in part:

... The State of Ohio brings this action to assure that the People of the State of Ohio receive their full measure of benefits under the Social Security Disability programs and to ensure that discrimination against the State's disabled residents is prohibited. The State of

Ohio also brings this action to assure that it is not required to expend State funds to provide public assistance to needy disabled people who have been or are receiving disability benefits and who have presented or will present a claim to the defendant for CDI [sic] and whose benefits have been terminated or who may in the future be improperly terminated.

New York's claims against the Secretary, as the court in *City of New York v. Heckler*, 578 F.Supp. at 1122–23, noted:

> ... In this case, New York [State] does *not* seek to protect its citizens from the operation of a statute. It seeks to *enforce* both the social security statute and the Administrative Procedure Act....

> \* \* \* \* \* \*

The *Mellon* doctrine is inapplicable in the instant case. New York does not question the validity of a federal statute. Nor does it invoke the Supreme Court's original jurisdiction [as Massachusetts did in *Mellon*]. It merely joins a class of its citizens, who are incapable of acting effectively for themselves because they are mentally disabled, in seeking to require the Secretary to adhere to her own regulations.

*See also Washington Utilities & Transportation Commission v. F.C.C.*, 513 F.2d 1142, 1153 (9th Cir.1975) (*Mellon* inapplicable where state relies on federal statute and seeks "to vindicate the congressional will by preventing what it asserts to be a violation of a statute by the administrative agency charged with its enforcement.")

The State has *parens patriae* standing to participate in this action against the Secretary.

### b. Fiscal and Budgetary Injuries

■ The State has also alleged that, above and beyond the injuries suffered by individual class members, it has suffered substantial financial injuries by having to assume the burden of supporting individuals terminated from federal disability programs. Paragraph 17 of the complaint in intervention states:

> Disabled persons whose benefits are terminated and who are unable to work must resort to the State of Ohio public assistance program. Most persons whose benefits are terminated then participate in ... [AFDC and/or GR.] Under the AFDC program, the non-federal share of the grant is 45 percent. Under the GR program the cash grant and medical payments are fully paid by the State and local sources. When the disabled persons receive SSI or SSDI the payments are fully funded by the federal government. As a consequence, the State of Ohio's funds are being depleted by the Defendant's actions.

The allegations in the complaint are taken as true and are to be construed in favor of the plaintiff. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976). Accepting them as true, it cannot be said that the State's injuries are too tenuous, indirect, or speculative to provide standing. The SSDI and SSI disability programs were enacted in part to relieve the states' welfare burden. Ohio's allegation that the Secretary's policies and actions have negated the programs' intent is sufficient to satisfy both constitutional and prudential standing requirements. *City of New York v. Heckler*, 578 F.Supp. at 1119–22; *see Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *Common Cause v. Bolger*, 512 F.Supp. 26, 30 (D.D.C.1980), *aff'd*, —— U.S. ——, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983).

### 2. Fed.R.Civ.P. 12(b)(6)

■ The Secretary finally argues that the State has failed to state a claim upon which relief can be granted. The gist of her argument is that BDD, which voluntarily agreed to perform disability determinations for the Secretary under the Act, can withdraw from the agreement by providing appropriate notice in accordance with 42 U.S.C. § 421(b)(2) or can resolve non-fiscal disputes by administrative appeal to the Commissioner of Social Security. 20 C.F.R. §§ 404.1681, 416.1081. Neither procedure provides Ohio an adequate opportunity to raise its statutory and constitutional claims. *See, e.g., Johnson v. Robinson*, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974); *Oestereich v. Selective Service Board*, 393 U.S. 233, 242, 89 S.Ct. 414, 21 L.Ed.2d 402 (Harlan, J., concurring) (and cases cited therein); *Herzog v. Secre-*

*tary of Health, Education and Welfare,* 686 F.2d 1154, 1161 (6th Cir.1982).

The Motion to Dismiss is denied.

## V. CLASS CERTIFICATION

■ Class actions are a frequently-endorsed means of challenging the policies and practices of the SSA. *Califano v. Yamasaki,* 442 U.S. at 701, 99 S.Ct. at 2557 ("class relief is consistent with the need for case-by-case adjudication emphasized by the Secretary, at least so long as the membership of the class is limited to those who meet the requirements of [§ 405(g) ]"); *Blankenship v. Secretary of Health, Education and Welfare,* 587 F.2d at 332 n. 4 ("The issues of statutory and constitutional "unreasonableness" are therefore common to all members of the class, and the claims advanced by the named plaintiffs in this regard are typical of the class"). Nonetheless, the plaintiffs still bear the burden of establishing their right to use the class action device. *Senter v. General Motors Corp.,* 532 F.2d 511, 522 (6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). In its March 21 ruling tentatively certifying the plaintiffs' proposed class, *see* note 1, *supra,* this Court found that the class satisfies all four criteria of Fed.R.Civ.P. 23(a) and the requirements of Rule 23(b)(2).

### A. *Rule 23(a) Prerequisites*

Fed.R.Civ.P. 23(a) provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

### 1. Numerosity

As noted earlier, at the class certification hearing on March 21, 1984 the parties stipulated that more than 23,000 Ohio residents who had previously been found to be entitled to SSDI and/or SSI benefits had their payments terminated during fiscal years 1981–1983. In addition, individuals potentially affected by future terminations under the standards challenged here include approximately 130,000 disabled Ohio workers who receive SSDI benefits and some 80,000 persons who receive SSI benefits.[19]

A class of several thousand satisfies all requirements of numerosity, *Mader v. Armel,* 402 F.2d 158 (6th Cir.1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969); 7 Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 1762 (1972 & Supp.1983). Furthermore, upon consideration of all the circumstances relevant to the ease of joinder surrounding each case, *Cash v. Swifton Land Co.,* 434 F.2d 569, 571 (6th Cir.1970); *Rettig v. Kent City School District,* 94 F.R.D. 12, 14 (N.D.Ohio 1980), it is clear that joinder of all class members would be impractical.

### 2. Commonality and Typicality

The Supreme Court has observed that:

The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest....

**19.** SSDI figures are as of December, 1980; SSI figures are as of September, 1982.

*General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982).

The class members' claims share common questions of fact and law. The common question of fact is: a class member's disability benefits were or may be terminated without a finding of medical improvement, or were or may be terminated because of the Secretary's failure to give presumptive effect to the prior determination of disability; further he or she presented or will present to the Secretary a claim for reinstatement of benefits; and finally he or she exhausted or will exhaust administrative remedies, or had exhaustion waived. The precise medical facts concerning each class member's disability are not relevant to this class action and do not present non-common facts for purposes of class certification. Likewise, the common question of law is: "What plaintiffs are seeking is this Court's ruling on the validity of ... administrative policies for determining eligibility for benefits, not an adjudication as to whether individual class members are entitled to benefits thereunder." *Johnson v. Heckler*, 100 F.R.D. 70 at 74 (N.D.Ill.1983).

The five named plaintiffs in these two cases present allegations which are typical of the claims of the class members. All were once granted SSDI and/or SSI benefits because of a medical disability; the Secretary found all of them to be no longer disabled without presenting evidence of medical improvement; all claim that they continue to be disabled; and all of them have lost or face the imminent loss of disability benefits. All pursue the same theory: that the Secretary's policies and practices violate statutory and constitutional mandates. Their interests are identical with all class members and if they succeed, all members of the class will receive the benefit of having their claims of continuing disability evaluated under a "medical improvement" or "presumption of continuing disability" standard.

### 3. Adequacy of Representation

The Supreme Court discussed the elements of adequate representation in *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975):

> ... [W]here it is unlikely that segments of the class appellant represents have interests conflicting with those she has sought to advance, and where the interests of the class have been competently urged at each level of the proceeding, we believe the test of Rule 23(a) is met.

In *Senter v. General Motors Corp.*, 532 F.2d at 524–25, the Sixth Circuit added:

> ... There are two criteria for determining whether the representation of the class will be adequate: (1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.

*See also Fradkin v. Ernst*, 98 F.R.D. 478, 484–87 (N.D.Ohio 1983).

The representativeness of the named plaintiffs is apparent from the prior discussion of commonality and typicality. Their ability to "vigorously prosecute" the action through "qualified counsel" is also clear. The consolidated cases have been skillfully prosecuted through the joint efforts of a law firm with considerable resources, and a legal aid office with expertise in disability benefits and in poverty law generally.

### B. *Rule 23(b)(2) Prerequisites*

Fed.R.Civ.P. 23(b) provides in pertinent part:

> (b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> \* \* \* \* \* \*
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole ...

The two-part test set forth by Rule 23(b)(2) requires that (1) the defendants must have acted or refused to act on grounds generally applicable to the class, and (2) the appropriate remedy is final injunctive or declaratory relief with respect to the class as a whole.

Here the Secretary has established a policy of refusing to apply the medical improvement standard when terminating disability benefits, and has applied or may apply that policy to all class members. The Secretary has refused to be bound by that standard notwithstanding the directive of the Sixth Circuit, whose views are consistent with nine other courts of appeals. Her conduct has been applicable to the class generally, and, if plaintiffs prevail, injunctive or declaratory relief with respect to the class as a whole will be the appropriate remedy. The requirements of Rule 23(b)(2) are satisfied.

## C. *Class Definition*

The March 21 oral opinion tentatively certifying the plaintiffs' proposed class made clear that the class might be redefined in this opinion. It is apparent that the class must exclude individuals whose benefits were terminated prior to July 21, 1981 (the date of the *Hayes* decision) and individuals who were properly taken off the benefit rolls for reasons unrelated to the issues in this case. The following class is therefore certified:

> All Ohio residents who received or receive Social Security Disability Insurance (SSDI) and/or Supplemental Security Income (SSI) benefits, and
>
> (1) have presented or will present to the Secretary a claim that their disabilities have continued; and

> (2) whose benefits have been terminated since July 24, 1981, or may be terminated in the future, because the Secretary has failed or may fail to
>
> (a) apply a medical improvement standard to their cases; or
>
> (b) give presumptive effect to a prior determination of disability; and
>
> (3) who have not
>
> (a) returned to substantial gainful activity; or
>
> (b) admitted they have medically recovered; or
>
> (c) lost eligibility for benefits for reasons unrelated to disability.

## D. *Certification*

■ For purposes of procedural clarity, only *Holden v. Heckler*, No. C84–548, will be certified as a class action. Guided by the *Manual for Complex Litigation*,[20] the plaintiffs suggest that certifying both cases would be potentially wasteful and confusing; instead, they recommend that one class be certified and that the named plaintiff or plaintiffs in the other one be allowed to appear in the certified case. Accepting this sensible proposal, this Court notes that *Holden* is being certified not because of any deficiencies in the party or counsel in *Brest v. Heckler*, No. C83–4893, but simply because the four named plaintiffs in *Holden*, whose cases are at different stages in the process for reviewing the termination of disability benefits, are more precisely representative of the various class members than is Mr. Brest himself. Brest is designated as a named party in *Holden*, and his counsel are appointed as co-counsel in that case.[21]

---

**20.** *See Manual for Complex Litigation* § 1.44, at 48–53, *reprinted at* 1 J. Moore, *Moore's Federal Practice* (2d ed. 1983).

**21.** *See Manual for Complex Litigation* at 50:

> After the court has selected the appropriate representatives of the classes or subclasses from among several parties seeking to act as representatives, alternative procedures are available for dealing with the individual claimants (and their counsel) who sought but did not receive designation as representatives. The court may deny the class action request on the part of those claimants in the other pending cases and permit the unsuccessful claimants to appear as parties in the class action by specific order without consolidation or by means of consolidation with the class action. . . .

## VI. PRELIMINARY INJUNCTION

The principal relief sought by the plaintiffs is a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) ordering the Secretary to stop using the current disability standard to terminate disability benefits and to restore benefits to those who were improperly terminated. The Sixth Circuit has repeatedly reiterated that, in exercising its discretion to grant a preliminary injunction, a district court must apply the four-part test originally formulated in *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977):

(1) whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the plaintiff has shown irreparable injuries;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by a preliminary injunction.

*Warner v. Central Trust Co., N.A.*, 715 F.2d 1121, 1123 (6th Cir.1983). While these factors are not to be applied in excessively rigid fashion, neither should a court merely apply a "balance of hardships" test. *Friendship Materials v. Michigan Brick, Inc.*, 679 F.2d 100 (6th Cir.1982).

### A. *Probability of Success*

Social Security cases in the Sixth Circuit have proceeded according to two separate and irreconcilable standards of law. Since July 24, 1981, the court of appeals, in the *Hayes, Hall* and *Burnett* cases, has articulated and applied a medical improvement standard. That court and district courts have repeatedly ordered the Secretary to restore benefits when the record contains no evidence that the claimant's condition has improved. Within the SSA and BDD administrative system, however, the Secretary has ignored the law of this circuit and continued to terminate individuals without demonstrating any medical improvement. Absent some compelling argument that a federal agency can legitimately ignore federal appeals court precedent, it is clear that

the plaintiffs will prevail on the merits of this case.

The Secretary's response is to state that the Sixth Circuit decisions in *Hayes, Hall*, and *Burnett* were only binding on the litigants in those cases.

... [T]here is no indication that the Secretary, having lost any of the cited cases, has refused to abide by the decision in respect to the individual parties therein. Plaintiffs claim only that the Secretary is not paying benefits to *other* persons who assert that their cases are similar to these individuals. But since those are different claims asserted by different parties, *res judicata* does not compel the Secretary to follow the results obtained in those cases.

Post-Hearing Brief at 27.

Her argument is utterly meritless. In *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 357 (6th Cir.1983), the Sixth Circuit sternly rebuked the National Labor Relations Board for refusing to follow the prior case law of the circuit. The court of appeals had consistently required the NLRB to consider the entire administrative record compiled by the Regional Director; the Board stated that it "disagree[s] with the Sixth Circuit's holding and respectfully decline[s] to follow it." *Southwest Color Printing Corp.*, 247 NLRB 917 (1980). Judge Celebrezze—who formerly headed HHS' predecessor, the Department of Health, Education and Welfare, and in that capacity supervised the SSA—responded for the court in *Kitchen Fresh:*

The Board's refusal to apply the [Sixth Circuit] rule in cases arising in Michigan, Ohio, Kentucky and Tennessee is particularly disturbing. Although the Board is charged with the responsibility of formulating national labor policy, the courts bear the final responsibility for interpreting the labor laws ... [s]ee *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 [2 L.Ed. 60] ... (1803); the Board is bound to apply the law of the circuit in which a case arises ... "We do not expect the Board or any other litigant to rejoice in all the opinions of this Court.... How-

ever, the Board cannot, as it did here, choose to ignore the decision of this court as if it had no force or effect. Absent reversal, the decision is the law which the Board must follow."

716 F.2d at 357 n. 12 (citations omitted). *See also Beverly Enterprises v. NLRB,* 727 F.2d 591, 593 (6th Cir.1984) (per curiam) ("The basic doctrine that, until reversed, the dictates of a Court of Appeals must be adhered to by those subject to the appellate court's jurisdiction applies equally to the precedential rule of *stare decisis* and the policy rule respecting the law of the case.").

The same rule applies to the Secretary, the SSA, and its affiliated state agencies. *Lopez v. Heckler,* 713 F.2d 1432, 1438 (9th Cir.1983) ("*Lopez I*") denying Secretary's motion to stay injunction pending appeal); *Hyatt v. Heckler,* 579 F.Supp. at 1001 ("A cabinet member is not above the law of the land, but is obligated to follow it. The Secretary is free to argue her position in any case she chooses, but, absent express authority from Congress or the federal courts, she can not offer an appeal in a newly-filed and unrelated case as an excuse to evade the law in this case.").

■ The Secretary also contends that her "non-acquiescence" policy is within the scope of *United States v. Mendoza,* —— U.S. ——, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). There the Supreme Court held that the doctrine of nonmutual collateral estoppel did not prevent the federal government from relitigating a constitutional issue adjudicated against it in a different lawsuit brought by a different party. No court in this circuit has barred the Secretary from relitigating the legal conclusion reached in *Hayes* and its progeny. But until she prevails in such a case, she must follow the established law. "The pertinent holding of *Mendoza* was only that the government must be allowed to challenge a law in court on its merits, *not* that an officer of the government may disobey court decisions with which he or she disagrees." *Hyatt v. Heckler,* 579 F.Supp. at 1002.

In sum, there is a strong probability that the plaintiffs will ultimately prevail on their statutory claim. It is therefore neither necessary nor appropriate to address their contention that the Secretary's policies and acts also constitute a violation of due process. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1860 n. 10, 75 L.Ed.2d 903 (1983).

*B. Irreparable Harm*

In Part IV–A–2–b, *supra,* this Court concluded that termination of disability benefits causes the plaintiff class irreparable harm not remediable by retroactive payments following a successful appeal. That analysis need not be repeated here.

■ The Secretary contends that any possibility of irreparable harm is negated by Governor Celeste's Executive Order 83–52, which requires BDD to

... (4) Refrain from "input processing" of adverse determinations resulting from the continuing disability review process, and except as specified herein and in cases of fraud, make no determinations that result in the cessation of SSI and/or SSDI benefits to any resident of the State of Ohio.

Consequently, the Secretary argues, the plaintiffs are "seeking to enjoin an event which is not going to take place at any foreseeable time in the future." Post-Hearing Brief at 33. In addition, since filing her brief, the Secretary has sent the following order to all SSA and affiliated state offices: "EFFECTIVE IMMEDIATELY ALL PROCESSING SHOULD STOP ON PERIODIC CDR CASES, NO MATTER WHAT STAGE IN THE PROCESS." Emergency DI/SSI Instruction OD–84–053(2214) (April 13, 1984). The order does not direct the Secretary's agents to apply the medical improvement standard. Nor has the Secretary indicated in other statements that she intends to apply that standard. *See* New York Times, April 14, 1984,

at 1, col. 2, and at 13, col. 1; HHS Press Release (April 13, 1984).

Any argument that these two moratorium orders shield the plaintiffs from irreparable harm ignores several salient points. First, it is within the discretion of the Governor and the Secretary to rescind their respective orders. Were they to do so, class members would face the immediate implementation of termination decisions that were reached under an improper standard. More importantly, the present moratoria provide no relief to the thousands of individuals who have already been terminated according to improper standards.

The Secretary further argues that the injunction sought by the plaintiffs, if issued, will trigger massive administrative and program costs resulting in irreparable harm to the Social Security trust funds and general federal revenues. She has not yet submitted an affidavit setting forth those costs; however, this Court accepts, *arguendo,* her contention that an injunction could impose a multi-million dollar burden on the federal government.

Like other courts which have considered this issue, this Court must find that the balance of hardships strongly favors the plaintiffs. The severe harm suffered by the plaintiff class is well-documented in the testimony and affidavits submitted at the preliminary injunction hearing. It has encompassed economic hardship, physical and emotional suffering, and perhaps even death. Protection of the integrity of the public fisc is important, particularly in light of recent Congressional declarations concerning the need to protect the Social Security Trust Fund. Social Security Amendments of 1983, Pub.L. No. 98–21, 97 Stat. 65; S.Rep. No. 98–23, 98th Cong., 1st Sess., H.R.Rep. No. 98–25, 98th Cong., 1st Sess., *reprinted in* 1983 U.S.Code Cong. & Ad. News 143, 219. But budgetary factors are not more important than protecting the rights to which the class members are entitled:

> In general, the courts are established to declare rights, and they should not take into account the resources of the

defendant as a reason for not declaring a right. Otherwise, the courts will have to go beyond examining the relationship of the parties, generally a sufficiently difficult task, and go into the relationship of the defendant to all other persons having a claim upon him, an essentially unmanageable task....

*Open America v. Watergate Special Prosecution Force,* 547 F.2d 605, 620 (D.C.Cir. 1976) (Leventhal, J., concurring); *Caswell v. Califano,* 583 F.2d 9, 17 (1st Cir.1978) ("the vindication of almost every legal right has an impact on the allocation of scarce resources. And the courts ... can hardly permit the legal rights of litigants to turn upon the alleged inability of the defendant fully to meet his obligations to others."); *cf. Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948) (limited circumstances in which court should stay enforcing declared right because of impossibility of compliance); *United States v. Rylander,* 460 U.S. 752, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983) (defendant has burden of proving impossibility of compliance).

Lastly, the Secretary submits that an injunction will interfere with nationwide uniformity in the administration of the disability programs. In light of the injunctions already imposed on the Secretary by federal courts in twenty states, there is little uniformity left to be disrupted. Furthermore, the consummate duty of this district court is to enforce the law as enunciated by the Supreme Court and the Sixth Circuit Court of Appeals and to insure that government officers obey it as well. It is neither convincing nor appropriate for the Secretary to assert that an injunction preventing her from violating the law constitutes "substantial harm".

## D. *The Public Interest*

As the Ninth Circuit panel wrote in *Lopez I,* "the question of the public interest is inseparable from the issues relating to the relative hardship suffered by the litigants." 713 F.2d at 1437. That court eloquently stated one element of the public interest

relevant to the ongoing series of cases concerning the medical improvement standard:

It is not only the harm to the individuals involved that we must consider in assessing the public interest. Our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges. Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required. It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time. It would be unfortunate, but far less harmful to society, were the government to succeed in overturning the preliminary injunction but be unable to recoup all or a portion of the funds.

In summary, the balance of hardships as between the litigants lies sharply in favor of the plaintiffs. When the public interest is included, that balance is overwhelming.

*Id.* at 1437–38.

Equally important, the public interest requires that this Court condemn the Secretary's contempt for the rule of law. In essence, her position has been that she can apply whimsically whatever standard she wishes in reviewing an individual's continued eligibility for disability benefits, no matter what the federal courts may say about the requirements of the Act, and no matter how tragic, or tragi-comic, the results.[22] The Secretary's stance is simply an affront to our constitutional system. To repeat Justice Brandeis' famous words:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to obey the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.... If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy....

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

E. *Scope of Injunctive Relief Available*

The plaintiffs have requested the following relief: 1) class certification; 2) preliminary injunction barring the Secretary from terminating any class member's benefits without applying a medical improvement standard; 3) reinstatement of prospective

---

**22.** Judge Goldberg has already drawn the apt analogy between the Secretary's pronouncements and certain statements in *Alice in Wonderland. Finnegan v. Matthews,* 641 F.2d at 1344 n. 5. It seems equally apposite to compare the results of her continuing disability reviews with the diagnoses found in *Catch-22*—in particular, the rosy prognosis painted by "the Texan" for "the soldier in white":

The soldier in white was constructed entirely of gauze, plaster and a thermometer, and the thermometer was merely an adornment left balanced in the empty dark hole in the bandages over his mouth early each morning and late each afternoon by Nurse Cramer and Nurse Duckett right up to the afternoon Nurse Cramer read the thermometer and discovered he was dead ...

 \* \* \* \* \* \*

No sound at all came from the soldier in white all the time he was there. The ragged round hole over his mouth was deep and jet black and showed no sign of lip, teeth, palate or tongue. The only one who ever came close enough to look was the affable Texan, who came close enough several times a day to chat with him about more votes for the decent folk, opening each conversation with the same unvarying greeting: "What do you say, fella? How you coming along?" The rest of the men avoided them both in their regulation maroon corduroy bathrobes and unraveling flannel pajamas, wondering gloomily who the soldier in white was, why he was there and what he was really like inside.

"He's all right, I tell you," the Texan would report back to them encouragingly after each of his social visits. "Deep down inside he's really a regular guy. He's just feeling a little shy and insecure now because he doesn't know anybody here and can't talk. Why don't you all just step right up to him and introduce yourselves? He won't hurt you."

J. Heller, *Catch-22* 171–72 (1970 ed.)

benefits for all previously terminated class members until the Secretary reviews their cases, with retrospective benefits if the initial termination is found to be improper; 4) notice to class members; and 5) authorization for class counsel to monitor compliance with all court orders.

 Once jurisdiction is established, courts possess remedial powers under the Act to provide equitable relief. Both class relief and injunctive relief are available. *Califano v. Yamasaki*, 422 U.S. at 698–701, 704–06, 99 S.Ct. at 2559–60. A mechanism for reinstating class members' benefits pending review of their files is within the scope of this equitable power. The function of a preliminary injunction is to preserve the status quo pending trial; in this case, as it appears likely that the Secretary acted illegally in revoking the prior findings of disability, the purpose of an injunction should be to restore the status quo as it existed prior to the challenged termination. *Lopez II*, 725 F.2d at 1508–09; *Mental Health Association of Minnesota v. Heckler*, 720 F.2d at 972. The later history of the *Blankenship* case demonstrates that courts in the Sixth Circuit have recognized the appropriateness of interim benefit payments to potential disability beneficiaries. *Blankenship v. Secretary of Health and Human Services*, 532 F.Supp. 739, 745 (W.D.Ky.1982), *stayed in part*, 722 F.2d 1282, 1284 (6th Cir.1983) (interim payments stayed pending Supreme Court ruling in *Day v. Schweiker*, 685 F.2d 19 (2d Cir.1982), *cert. granted*, —— U.S. ——, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983)). In sum, all the relief requested by the plaintiffs is within this Court's equitable discretion under 42 U.S.C. § 405(g). Mandamus jurisdiction also supports an allowance of interim benefits. *City of New York v. Heckler*, 578 F.Supp. at 1125 (and cases cited therein).

 As a practical administrative matter, however, this Court believes class members should be required to inform the Secretary that they believe their terminations to have been improper. Benefits may then appropriately be reinstated. *Lopez v.*

*Heckler*, 572 F.Supp. 26, 33 (C.D.Cal.1983); *Trujillo v. Heckler*, No 82–K–1505 (D.Colo. Dec. 15, 1983) (ordering granting permanent injunction); *Hyatt v. Heckler*, No. C–C–83–655–M (W.D.N.C. March 27, 1984) (order certifying class and requiring notice). [579 F.Supp. 985]. The following order sets forth the mechanism to govern the reinstatement and review procedure.

## VII. RELIEF

IT IS ORDERED THAT:

(1) The Secretary's Motion to Dismiss the Complaint in Intervention by the State of Ohio is denied.

(2) The following class is certified in *Holden v. Heckler:*

All Ohio residents who received or receive Social Security Disability Insurance (SSDI) and/or Supplemental Security Income (SSI) benefits, and

(1) have presented or will present to the Secretary a claim that their disabilities have continued; and

(2) whose benefits have been terminated since July 24, 1981, or may be terminated in the future, because the Secretary has failed or may fail to

(a) apply a medical improvement standard to their cases; or

(b) give presumptive effect to a prior determination of disability; and

(3) who have not

(a) returned to substantial gainful activity; or

(b) admitted they have medically recovered; or ·

(c) lost eligibility for benefits for reasons unrelated to disability.

(3) The Secretary is hereby enjoined from terminating the SSDI and/or SSI benefits of any class member unless she can demonstrate a material medical improvement in the recipient's condition. Material medical improvement is defined as follows:

Material improvement means that in comparison to the last most recent decision, the medically determinable physical or mental impairment(s) which prevented

the person from doing substantial gainful activity and entitled the individual to disability benefits has decreased to the point that the person can now perform substantial gainful activity. This improvement must be demonstrated by medical evidence consisting of signs, symptoms, and laboratory findings and must show positive changes in functional abilities, symptoms or laboratory findings or that the effect of the impairment(s) on the person has decreased. Prior administrative error means the determination allowing or continuing disability was plainly incorrect based upon substantial evidence. Such improvement may also be found when:

(a) New medical evidence shows that while an individual's underlying condition may not have changed, advances in medical therapy or technology have reduced or eliminated the effect the condition had on the individual; or

(b) New or improved diagnostic techniques or other medical evaluations show that an individual's previously determined medical condition is not as serious as it was supposed to be at the time of the most recent prior determination; or

(c) New evidence shows that while an individual's underlying condition may not have changed, the individual's vocational abilities have so improved through education or training acquired up to the time of the most recent determination of disability that he or she is able to engage in substantial gainful activity; or

(d) The individual has compensated or adjusted to the effects of his medical condition resulting in the ability to engage in substantial gainful activity, or there has been a change in prognosis.

(4) The Secretary is ordered to mail or direct her agents at the Ohio Bureau of Disability Determinations to mail, within sixty (60) days of the date of this Order, to all class members whose benefits have been terminated since July 24, 1981, and not subsequently reinstated, a notice describing the medical improvement standard and informing the recipient that his or her benefits may have been improperly terminated. The notice shall instruct class members of their right to apply for reinstatement of benefits if they believe their medical condition has not materially improved since the initial finding of disability. Upon receiving a properly completed form, the Secretary shall

(a) Reinstate benefits in the monthly amounts the class member would have been receiving if his or her benefits had not been interrupted; and

(b) Review the class member's file on a priority basis, within time limits to be determined by this Court and in accordance with the medical improvement standard as defined in paragraph (3), to determine whether the prior termination was proper or improper. Class members may request that BDD review their case at the initial level or may have BDD or SSA conduct the review at whatever appellate level their case has reached.

(i) If the termination is found to have been proper, the class member shall have the right to appeal to the next appropriate administrative or judicial level. The continuation of benefits pending appeal shall be governed by the statutes and regulations governing that stage of the review process.

(ii) If the termination is found to have been improper, the class member shall be awarded the appropriate retroactive benefits immediately.

(5) The files of named plaintiffs Brest, Holden, Baker and Grant, who have already indicated in their complaints that they believe they were terminated improperly, are remanded to the Secretary for immediate reinstatement of benefits and review in accordance with paragraph (4). All further administrative proceedings involving named plaintiff McGinty shall be conducted in accordance with the standards set forth in paragraph (3).

(6) The Secretary shall provide plaintiffs' counsel with copies of all policy statements or directive issued by SSA or BDD for the purpose of implementing the

terms of this injunction. SSA and BDD shall keep records of the names and pertinent information regarding the persons who respond to the class notice, and shall supply lists containing such information to plaintiffs' counsel on the first day of each month following the mailing of the notices.

(7) The parties are ordered to submit to this Court:

(a) Within ten (10) days, proposed language for the class notice, and the reply form mandated by paragraph (4), and for supplemental notice to be provided to class members through press releases, radio and television announcements, posters in public buildings and in medical facilities, and a toll-free information telephone number. The parties shall either stipulate to language acceptable to both sides or indicate in writing their precise areas of disagreement.

(b) Within thirty (30) days, proposals for an appropriate schedule for BDD and SSA to conduct the reviews mandated in paragraph (4)(b).

(c) Within thirty (30) days, estimates as to what further hearings or other proceedings will be necessary before a final order may be entered in these cases.

IT IS SO ORDERED.

## MEMORANDUM AND ORDER

### On Motion For Stay Pending Appeal

This class action concerns the refusal of the Secretary of Health and Human Services ("Secretary") to apply the appropriate legal standard, as enunciated by the Sixth Circuit Court of Appeals, when she terminated the social security disability benefits of thousands of Ohio residents during the past three years. In an April 30, 1984 Memorandum and Order, this Court certified a class and issued a preliminary injunction on behalf of the plaintiffs. The opinion defined the medical improvement standard the Secretary must utilize in reviewing continuing eligibility for disability benefits. It also established a process for restoring benefits to individuals who were improperly terminated, pending a new review under the proper standard.

The Secretary filed a Notice of Appeal on May 4. Five days later, she filed a Motion for Stay Pending Appeal, pursuant to Fed. R.App.P. 8(a).[1] The Motion seeks a stay of all portions of the April 30 Order "except paragraph 7(a) thereof, pending appeal to the Sixth Circuit Court of Appeals."[2] Oral argument was held on May 23. This Court has also reviewed four significant appellate opinions issued in the past three weeks: *Heckler v. Lopez,* —— U.S. ——, 104 S.Ct. 2164, 80 L.Ed.2d 548 (1984), in which the Supreme Court issued a partial stay of a similar injunction pending filing and disposition of a petition for writ of certiorari; *Heckler v. Ringer,* —— U.S. ——, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), in which the Court discussed relevant jurisdictional issues under the judicial review provision of the Social Security Act ("the Act"), 42

---

1. Fed.R.App.P. 8(a) requires that "[a]pplication for a stay of the judgment or order of a district court pending appeal ... must ordinarily be made in the first instance in the district court." The Secretary's Motion is therefore properly before this Court pursuant to Fed.R.Civ.P. 62(c).

2. Familiarity with the Order is presumed. Paragraph (7)(a) required the parties to submit proposed language for the class notice to this Court, which they have done. It should be noted, however, that several other paragraphs of the Order are not properly subject to the Motion for Stay. Paragraphs (1) and (2) deny a Motion to Dismiss and certify a class. Since these are neither final decisions under 28 U.S.C. § 1291, appealable interlocutory orders under

§ 1292(a), nor "controlling questions of law" meriting certification for interlocutory appeal under § 1292(b), a request for a stay pending appeal is inappropriate. And paragraph (3) defines the "medical improvement" standard that is to be applied in future disability reviews. The Secretary nowhere argues that imposition of this standard is erroneous. *See* Part I, *infra.*

The Motion for Stay, then, is deemed·to be limited to paragraph (4) (setting forth procedures for reinstating improperly terminated benefits), paragraph (5) (ordering relief for named plaintiffs), and paragraphs (6), (7)(b) and (7)(c) (dealing with implementing paragraph (4) and expediting final resolution of these cases).

U.S.C. § 405(g); *Heckler v. Day,* —— U.S. ——, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984), containing a further discussion of the appropriate relationship between federal courts and the Social Security Administration ("SSA"); and *Haynes v. Secretary of Health and Human Services,* 734 F.2d 284 (6th Cir.1984), in which the Sixth Circuit vigorously reaffirmed its adherence to the medical improvement standard in disability termination cases. After considering these cases and the parties' arguments, this Court must stay paragraph (4) of the Order with respect to one portion of the class, but denies the remainder of the Motion for Stay.

## I.

The standards for granting a stay pending appeal are the same as those for granting a preliminary injunction. *Hamlin Testing Laboratories, Inc. v. United States Atomic Energy Commission,* 337 F.2d 221, 222 (6th Cir.1964); *Virginia Petroleum Jobbers Assn. v. FPC,* 259 F.2d 921 (D.C.Cir.1958); 11 Wright, Miller & Elliott, *Federal Practice and Procedure: Civil* § 2907 (1973 & Supp.1983). In its opinion granting a preliminary injunction, this Court applied the Sixth Circuit's four-part test, originally formulated in *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977):

 (1) whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

 (2) whether the plaintiff has shown irreparable injuries;

 (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and

 (4) whether the public interest would be served by a preliminary injunction.

*Warner v. Central Trust Co., N.A.,* 715 F.2d 1121, 1123 (6th Cir.1983). While these factors are not to be applied in an excessively rigid fashion, neither should a court merely apply a "balance of hardships" test.

*Friendship Materials v. Michigan Brick, Inc.,* 679 F.2d 100 (6th Cir.1982).

In her Motion, the Secretary states that she "seeks a stay of this Court's order for two reasons": (1) "the Court ordered the Secretary to reopen claims and to reinstate payments to individuals over whom it lacked jurisdiction"; and (2) "interim benefits have been awarded without statutory authority." Brief in Support of Motion ("Brief") at 3. The Secretary also stresses the need "to avoid irreparable harm to the Social Security Administration and the public fisc ..." *Id.* at 2.

## A. Likelihood of Success on the Merits

The substantive issue in this case is the Secretary's continuing refusal to obey the Sixth Circuit's rulings that under the Act she may not terminate disability benefits without offering substantial evidence that the record supporting the initial determination of disability is no longer valid. This rule of law, known as the "medical improvement standard" or "presumption of continuing disability", has been the law of this circuit since July 24, 1981, the date of *Hayes v. Secretary of Health, Education and Welfare,* 656 F.2d 204 (6th Cir.1981). The Secretary stipulated that she had not applied the *Hayes* standard to other disability cases. In entering a preliminary injunction, this Court rejected her "utterly meritless" position that she could ignore the court of appeals' interpretation of the Act.

Nowhere in the Motion for Stay does the Secretary challenge this Court's interpretation of the legal obligation that *Hayes* and its progeny impose upon her. That interpretation is fully consistent with the Sixth Circuit's recent ruling in *Haynes v. Secretary of Health and Human Services.* There the court reviewed a record containing "overwhelming evidence that appellant's condition has remained essentially unchanged since she was initially found disabled." At 288. It stated:

 While this Court has not specifically addressed the issue of the allocation of the burden of proof in termination

cases [3], we have explicitly found error in the Secretary's failure to consider evidence of lack of improvement in the claimant's condition. In *Hayes v. Secretary,* ... this Court held that disability benefits were improperly terminated where the Secretary ignored evidence which indicated that the claimant's "... condition had not changed since she had begun receiving benefits." We have thus presumed that a previous disability determination is valid unless evidence to the contrary can be produced. In light of this stated predilection and the persuasive analysis of the Ninth, Eleventh, Fifth and Third Circuits, we hold that the Secretary's initial determination that Haynes was disabled gives rise to a presumption that she is still disabled. *See Hayes,* 656 F.2d at 204.

This presumption of continuing disability requires that the Secretary produce evidence that the claimant's condition has improved, and in the absence of such evidence the claimant will be deemed to be still disabled. If the Secretary produces evidence that the claimant's condition has improved, the claimant, bearing the ultimate burden of showing disability, may, of course, produce evidence to the contrary....

*Id.* at 288 (citation omitted).

Ignoring this Court's substantive ruling on the merits of the plaintiffs' case, the Secretary argues once again that many class members have failed to satisfy the jurisdictional prerequisites for federal court review of administrative termination decisions. Since the Supreme Court decisions in *Heckler v. Lopez* and *Heckler v. Ringer* deal with these prerequisites, it is important to review the requirements of the Act, the prior case law, this Court's original ruling, and the changes in the law wrought by the two recent rulings.

The Act provides for federal district court review of determinations by the Sec-

retary that a claimant's disability has ceased and that his or her benefits should be terminated. Title 42 U.S.C. § 405(g) provides in part:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such determination by a civil action commenced within sixty days after the mailing to him of notice of such decision .... The Court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing....

1. *Presentation and Exhaustion*

While the requirement of a final decision by the Secretary is "central to the requisite grant of subject-matter jurisdiction", *Weinberger v. Salfi,* 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975),

... this condition consists of two elements, only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary.

*Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976).

Relying on *Mathews v. Eldridge* and numerous later appellate opinions, this Court held that a class limited to individuals who "have presented or will present to the Secretary a claim that their disabilities have continued" satisfied the presentation requirement. Except for an unsubstantiated allegation—never raised in her earlier pleadings and arguments—that the class definition leaves her unsure "what consti-

---

**3.** *But see Burnett v. Secretary of Health and Human Services,* 703 F.2d 559 (6th Cir.1982), and *Hall v. Secretary of Health and Human Services,* 711 F.2d 1056 (6th Cir.1983) ("the Sec-

retary must produce evidence of improvement in the claimant's condition"), discussed in Memorandum and Order at 21.

tutes 'presentment' ", Brief at 6, the Secretary does not seriously challenge that ruling. Instead, she focuses on the exhaustion requirement.

*Heckler v. Ringer* recently summarized the prior case law concerning the § 405(g) exhaustion requirement:

> ... We have held that the Secretary herself may waive the exhaustion requirement when she deems further exhaustion futile ... We have also recognized that in certain special cases, deference to the Secretary's conclusion as to the utility of pursuing a claim through administrative channels is not always appropriate. We held that *Mathews v. Eldridge* ... was such a case, where the plaintiff asserted a procedural challenge to the Secretary's denial of a pretermination hearing, a claim that was wholly "collateral" to his claim for benefits, and where he made a colorable showing that his injury could not be remedied by the retroactive payment of benefits after exhaustion of administrative remedies.

104 S.Ct. at 2023 (citations omitted).

In its April 30 opinion, this Court found that the class satisfied each of these three exceptions to the exhaustion requirement. First, the class' "claims are collateral, for they are by no means confined to a direct claim for the payment of benefits. Rather, the principal relief sought is an order that in conducting disability benefits terminations the Secretary must apply the medical improvement standard adopted by this circuit in *Hayes*." Memorandum and Order at 40. Second, injuries to class members could not be fully remedied by administrative appeals or later appeals to federal court, because when class members' "disability benefits were terminated, they and their dependents often went without proper food, shelter and medical treatment", often suffered "severe stress" and related ailments, and also incurred "the 'irreparable

harm inherent in the pursuit of administrative relief ...' " *Id.* at 42 (citation omitted). Finally, since the Secretary had not indicated any intention to change her long-standing policy of defying the rule of law set forth in *Hayes*, it was held that " 'exhaustion of administrative remedies becomes a mere exercise in futility, both for the claimants and for the courts.' " *Id.* at 43 (citations omitted).

*Heckler v. Ringer* overturns none of these conclusions. The pertinent portion of the opinion concerns district court jurisdiction over an action commenced by three individuals seeking reimbursement for surgical expenses under the Medicare Act, 42 U.S.C. § 1395 *et seq.* Without exhausting their administrative remedies, they challenged the Secretary's instructions precluding payment for that particular type of surgery, even though they were not actually subject to the ruling. The Court found that they

> ... do not raise a claim that is wholly "collateral" to their claim for benefits under the Act, ... have no colorable claim that an erroneous denial of [the] benefits in the early stage of the administrative process will injure them in a way that cannot be remedied by the later payment of benefits ... [and that, because] the administrative ruling is not even applicable to [their] claims ... exhaustion is in no sense futile ...

*Id.* at 2023. Nothing in the Court's rejection of the unusual and premature claims in *Ringer* modifies the well-established exceptions to the exhaustion requirement nor requires any alteration in this Court's previous ruling. The holding that the entire proposed class has satisfied the exhaustion requirement of § 405(g) is reaffirmed.[4]

### 2. *Sixty-Day Requirement*

■ The most persuasive argument raised in the Secretary's Motion is that

---

**4.** *Heckler v. Ringer* does modify this Court's holding that the federal mandamus statute, 28 U.S.C. § 1361, provides an alternate basis of jurisdiction for the class' claims even when § 405(g) jurisdiction is proper. Memorandum and Order at 45–47. *See* 104 S.Ct. at 2022–2023

(mandamus statute "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."). This issue, however, is not relevant to the Motion for Stay.

*Heckler v. Lopez* provides new support for her argument that

> The 60-day provision in 42 U.S.C. § 405(g) is an absolute time-bar to claims where claimants (i) did not seek administrative review of the initial administrative determination by the state agency that they were no longer disabled and permitted more than 60 days to elapse thereafter without taking any further action; (ii) did seek reconsideration or an ALJ hearing, but did not pursue the matter further and permitted more than 60 days to elapse without taking any further action; or (iii) exhausted their administrative remedies more than 60 days before this class action was filed but did not seek judicial review pursuant to 42 U.S.C. § 405(g).

Brief at 9.

In its opinion, this Court found that this contention seriously misread the case law concerning the sixty-day requirement, holding that:

> ... the sixty-day requirement is not jurisdictional, *Weinberger v. Salfi*, 422 U.S. at 764 [95 S.Ct. at 2466], and is subject to waiver by the Court. For the same reasons the exhaustion requirement is waived for class members who did not literally satisfy it, the sixty-day requirement is waived as well. *Lopez [v. Heckler]*, 725 F.2d [1489,] 1504–07 [ (9th Cir. 1984) ].

Memorandum and Order at 44.

On the same day, the Supreme Court issued its per curiam order in *Heckler v. Lopez*, which reads in its entirety:

> The application for stay presented to Justice Rehnquist and by him referred to the Court is denied, insofar as it relates to the claims of respondent class members whose benefits were terminated on or after December 6, 1982, or who completed the administrative appeal process on or after December 6, 1982. As to all other members of the respondent class, the application for stay of judgment of the United States Court of Appeals for the Ninth Circuit is granted pending the

timely filing and final disposition of a petition for writ of certiorari.

104 S.Ct. at 2164. Obviously, the history of the *Lopez* litigation must be examined to determine what effect this cryptic order should have on this case.

The class action complaint in *Lopez* was filed on February 4, 1983. The plaintiffs sought an injunction requiring the Secretary to obey two Ninth Circuit "medical improvement" cases, *Finnegan v. Matthews*, 641 F.2d 1340 (9th Cir.1981), and *Patti v. Schweiker*, 669 F.2d 582 (9th Cir. 1982). On June 16, 1983, the District Court certified a class covering the entire Ninth Circuit and comprising individuals who had had their benefits terminated, or faced termination, because of the Secretary's refusal to obey the law. It also issued a preliminary injunction compelling her to follow *Finnegan* and *Patti* and to reinstate class members' benefits pending a hearing under the proper standard. The portion of the injunction dealing with reinstatement, paragraph 4(c), is similar to paragraph (4) of this Court's Order. *Lopez v. Heckler*, 572 F.Supp. 26, 32 (C.D.Cal.1983). On August 24, the Ninth Circuit issued a full opinion denying the Secretary's "emergency" Motion for Partial Stay Pending Appeal. *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983).

The Secretary then appealed to Circuit Justice Rehnquist. On September 9, he granted the Secretary's application to stay paragraph 4(c) of the injunction until the Ninth Circuit ruled on the merits of her appeal. *Heckler v. Lopez*, 464 U.S. ——, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983). He suggested that the District Court's conclusions—that exhaustion of administrative remedies would be futile and that the plaintiff class raised a collateral constitutional question obviating the need for exhaustion—were inconsistent with *Weinberger v. Salfi* and *Mathews v. Eldridge*. 104 S.Ct. at 14–15.

On October 11, 1983, the full Court denied a motion to vacate the stay. *Heckler v. Lopez*, 464 U.S. ——, 104 S.Ct. 221, 78 L.Ed.2d 217 (1983). Justices Brennan and

Marshall dissented, and Justices Stevens and Blackmun dissented in part. Justice Stevens wrote:

> ... It is my understanding that this class action was filed on February 4, 1983, and that the class certified by the District Court includes persons who were entitled to, but did not seek judicial review by an adverse final decision by the Secretary more than 60 days before February 4, 1983 (December 6, 1982). As I understand ¶ 4(c) of the injunction entered by the District Court, it grants relief to class members over whom the District Court had no jurisdiction—specifically, to class members who had received "final decisions" from the Secretary more than 60 days prior to February 4, 1983, and who had not timely sought judicial review. To the extent that the stay entered by Justice REHNQUIST applies to such persons, I agree that it was properly entered. These persons' right to seek administrative or judicial review of their termination decisions had expired, and they could obtain benefits only by requesting that the Secretary reopen their cases. However, the District Court had no jurisdiction to review the Secretary's refusal to reopen these cases.... Hence, the District Court had no jurisdiction over these persons and should not have granted them relief ...

> I believe, however, that the application to vacate the stay should be granted insofar as it applies to persons who sought judicial review of a termination of their benefits ordered by the Secretary on or after December 6, 1982, and persons whose right to administrative review of that termination had not expired before December 6, 1982. As to these persons, I believe both the waivable and non-waivable elements of 42 U.S.C. § 405(g) were satisfied; hence the District Court had jurisdiction to enter injunctive relief.

104 S.Ct. at 222–23 (citations omitted).

On February 22, 1984, the Ninth Circuit affirmed the preliminary injunction. *Lopez v. Heckler*, 725 F.2d 1489 (9th Cir.1984). As in its earlier ruling on the Motion for Partial Stay, the Court of Appeals vigorously endorsed the District Court's substantive conclusions and denounced the Secretary's refusal to obey federal court orders. One member of the panel concurred in the judgment but agreed with Justice Stevens that the lower court lacked jurisdiction under § 405(g) over claimants who failed to satisfy the sixty-day limitation. *Id.* at 1510–11 (Boochever, J., concurring).

The Secretary filed another application for stay with the Supreme Court, which then issued the April 30 ruling quoted in full above. The order follows the position set forth by Justice Stevens in his opinion on the earlier motion to vacate the stay pending appeal. The Supreme Court clearly has grave doubts about the propriety of granting injunctive relief to individuals who failed to satisfy the sixty-day requirement; the Court almost certainly would issue a similar partial stay if presented with an application in this case. At the same time, the Court in *Heckler v. Lopez* has left intact all other portions of the District Court's preliminary injunction. Accordingly, adherence to precedent requires this Court to deny the Motion for Stay except with respect to class members who failed to meet the sixty-day requirement. The parameters of the stay are set forth in Part III, *infra.*

■ Plaintiffs and intervenor correctly point out that summary orders are not to be construed as changing previous case law. *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). They also offer a number of interesting arguments to distinguish *Heckler v. Lopez* from this case: first, that the Sixth and Ninth Circuits have different standards for issuing preliminary injunctions; next, that the circuit-wide *Lopez* class poses a greater administrative burden than the state-wide *Holden* class; and finally, that the presence of the State of Ohio as an intervenor shifts the equities in this case. These contentions, however, fail to persuade this Court that a Supreme Court ruling in an

essentially identical case does not control this case.

### 3. *"Interim Benefits"*

The Secretary also contends that the reinstatement provisions of the Order will force her to pay "interim benefits" in a manner which violates sovereign immunity, the "final decision" requirement of 42 U.S.C. § 405(i), and the public policy expressed in now-expired 1983 statutes authorizing interim benefits pending final disability determinations.[5] Her argument misreads this Court's ruling. Paragraph (4) does not provide for "interim benefits" to individuals who have never been found to be disabled; rather, it creates "[a] mechanism for reinstating class members' benefits pending review of their files" under the proper medical improvement standard. Memorandum and Order at 69. Like paragraph 4(c) of the *Lopez* preliminary injunction, this Court's ruling "merely instructs the Secretary to reinstate that earlier final decision pending determination of the validity of the revocation." *Lopez v. Heckler*, 725 F.2d at 1508. Since the Supreme Court has not stayed that order with respect to class members who satisfy jurisdictional prerequisites, this Court sees no reason to stay its ruling. Finally, even assuming that paragraph (4) is read to authorize "interim benefits", nothing in *Heckler v. Day* overrules the endorsement of such benefits found in *Blankenship v. Schweiker (Secretary of Health and Human Services)*, 722 F.2d 1282 (6th Cir.1983). *See* 104 S.Ct. at 2258 n. 34 ("... we need not address the propriety of that part of the District Court's order requiring payment of interim benefits.").

### B. Irreparable Injury, Balance of Hardships, and Public Interest

With respect to the other factors relevant to the issuance of a preliminary injunction, the Secretary refers to the "irreparable harm to the trust funds and the public fisc" to be inflicted by "interim benefits" and the administrative costs of com-plying with this Court's Order. Brief at 14. She contends that benefits to individuals reinstated under the Order will cost $8.3 million per month and that administrative costs will total $3.3 million. *See* Affidavit of Jean Hall Hinckley. The plaintiffs and intervenor suggest that these figures are "grossly inflated and invalid" and submit an affidavit from Leonard Herman, director of the Ohio Bureau of Disability Determinations, estimating that the benefits will cost $2.1 million per month and administration will cost $821,700.

For the reasons set forth in the Memorandum and Order at 64–69, this Court rejects the Secretary's claims of irreparable harm. Whatever costs the Secretary faces are the result of her defiance of the law, and constitute no reason whatsoever for staying the preliminary injunction.

### II.

Since *Heckler v. Lopez* requires a stay of paragraph (4) with respect to certain class members, this Court must now determine the appropriate cut-off date. That determination requires a review of the history of this class action.

On September 6, 1983, named plaintiff Gerald Brest filed a motion to proceed *in forma pauperis* and a *pro se,* class action complaint. Brest sought a reinstatement of benefits, class certification, and a preliminary injunction similar to that issued in *Lopez*. *Brest v. Heckler*, No. C83–3634Y (N.D.Ohio filed Sept. 6, 1983). This Court granted the motion to proceed *in forma pauperis* and cognizant of a *pro se* plaintiff's inherent inability to prosecute a class action—appointed counsel for Brest pursuant to 28 U.S.C. § 1915(d). Counsel filed a new complaint, *Brest v. Heckler*, No. C83–4893 (N.D.Ohio filed Dec. 14, 1983), and the original *pro se* complaint was dismissed. The subsequent history of the *Brest* case, and its consolidation with *Holden v. Heckler*, No. 84–548 (N.D.Ohio filed Feb. 16, 1984), is set forth in the Memorandum and Order at 3–4. This Court certified the *Hol-*

---

5. Pub.L. 97–455, 96 Stat. 2497 (Jan. 12, 1983), and Pub.L. 98–118, 97 Stat. 803 (Oct. 11, 1983).

*den* case as a class action, but designated Brest as a named party in that case and appointed his counsel as class co-counsel, along with the *Holden* attorneys. *Id.* at 59.

Upon consideration, this Court agrees with plaintiffs and intervenor that the statute of limitations must be dated from September 6, 1983, when the original *Brest* action was commenced. At all times since that date, the Secretary has been on notice that a class of plaintiffs seeks to challenge her refusal to apply a medical improvement standard to terminations of Ohio residents' disability benefits.

The Supreme Court first considered the relation between class actions and statutes of limitations in *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974), where it stated:

> ... We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.

It reiterated this point last year in *Crown, Cork & Seal Co., Inc. v. Parker,* —— U.S. ——, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983), a Title VII suit, holding that

> ... Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action.

Accordingly, the sixty-day statute of limitations under § 405(g) was tolled as of September 6, 1983—the date Brest commenced his action by filing a motion to proceed *in forma pauperis. See* 4 Wright, Miller & Kane, *Federal Practice & Procedure: Civil* § 1052 (1969 & Supp.1983); *Krajci v. Provident Consumer Discount Co.,* 525 F.Supp. 145 (E.D.Pa.1981). At all times since then there has been a class action properly before this Court. Sub-

tracting sixty days from September 6 leaves the deadline at July 8. In addition, plaintiffs and intervenor argue persuasively that the deadline should be extended an additional five days, since both SSDI and SSI regulations calculate deadlines from the "date you receive notice", which "means 5 days after the date on the notice." 20 C.F.R. §§ 404.901, 416.1401; *see* 20 C.F.R. § 422.210(c) ("Any civil action ... must be instituted within 60 days after the Appeals Council's notice ... is received by the individual, institution or agency ..."). The stay of paragraph (4) of the Order therefore must apply only to individuals whose benefits were terminated or who completed the administrative appeal process before July 3, 1983—sixty-five days before September 6.

Plaintiffs also argue that class members affected by the stay should receive notice of the status of this case and of their right to request reopening and revision of defendant's determinations and decisions, pursuant to 20 C.F.R. §§ 404.987 *et seq.,* 416.1487 *et seq.,* and *Parker v. Califano,* 644 F.2d 1199 (6th Cir.1981). Since this stay ruling in no way constitutes a decision on the merits that these class members are not entitled to any relief, but merely postpones enforcement of paragraph (4) of the Order with respect to their claims, this point is well-taken. Pursuant to Part III, paragraph (2), *infra,* the parties shall submit a proposed notice to be sent to those class members who are subject to the stay, as well as a revised notice to be sent to the remaining class members, who are entitled to immediate relief.

III.

IT IS ORDERED THAT:

(1) The Motion for Stay Pending Appeal is denied, except that paragraph (4) of the Memorandum and Order of April 30, 1984 is stayed pending appeal with respect to the claims of class members whose benefits were terminated before July 3, 1983, or who completed the administrative process before July 3, 1983.

(2) The parties shall submit to this Court within six (6) days modifications of the proposed language for the class notice previously submitted pursuant to paragraph (7)(a) of the April 30 Order. Two proposed notices are to be submitted, one for class members entitled to immediate relief, the other for class members affected by paragraph (1) of this Order.

(3) The deadlines of paragraphs (7)(b) and (7)(c) of the April 30 Order are extended by ten (10) days.

IT IS SO ORDERED.